## NATIONAL LABOR RELATIONS BOARD v. SOUTHERN BELL TELEPHONE & TELEGRAPH CO.*

No. 460.   Argued March 5, 8, 1943.—Decided May 3, 1943.

---

*Together with No. 461, *National Labor Relations Board* v. *Southern Association of Bell Telephone Employees,* also on writ of certiorari, 317 U. S. 618, to the Circuit Court of Appeals for the Fifth Circuit.

*Mr. Robert B. Watts,* with whom *Solicitor General Fahy* and *Messrs. Robert L. Stern* and *Ernest A. Gross* and *Miss Ruth Weyand* were on the brief, for petitioner.

*Mr. Marion Smith,* with whom *Mr. John A. Boykin, Jr.* was on the brief, for respondent in No. 460; and *Mr. James A. Branch,* with whom *Mr. Frank A. Hooper, Jr.* was on the brief, for respondent in No. 461.

MR. JUSTICE REED delivered the opinion of the Court.

On this certiorari the question is whether the order of the Board herein is supported by substantial evidence. Upon charges filed by the International Brotherhood of Electrical Workers, A. F. of L., the Board issued a complaint on February 17, 1941, against respondent Southern Bell Telephone and Telegraph Company, charging inter alia that respondent company was dominating and supporting respondent Southern Association of Bell Telephone Employees, hereafter referred to as the Association, as a labor organization of its employees in violation of § 8 (2) of the act, and that in other ways respondent company had interfered with the rights of its employees in the exercise of rights guaranteed them by § 7 in violation of § 8 (1) of the act.[1] After hearing, the Board made find-

[1] The pertinent provisions of the National Labor Relations Act, 49 Stat. 449, 29 U. S. C. § 151 *et seq.,* are as follows:

"SEC. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted

ings and conclusions in support of the stated charges and ordered that respondent cease and desist from dominating or interfering with the Association, from contributing financial and other support, recognizing it as the collective bargaining agency of its employees and giving effect to or entering into any collective bargaining contract with the Association and further that it cease and desist from interfering with its employees in the exercise of their rights, including the right to organize and bargain collectively, as guaranteed by § 7 of the act. Affirmative action ordered was that respondent withdraw all recognition from the Association and post appropriate notices to its employees.

Separate petitions were filed in the court below by respondent and the Association to review this order and

activities, for the purpose of collective bargaining or other mutual aid or protection.

"Sec. 8. It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7.

"(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: *Provided,* That subject to rules and regulations made and published by the Board pursuant to section 6 (a), an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay.

.    .    .    .    .

"Sec. 10. . . .

"(c) . . . If upon all the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act. . . .

.    .    .    .    .

"(f) . . . the findings of the Board as to the facts, if supported by evidence, shall . . . be conclusive."

the Board answered, requesting enforcement. The court below held that the Board's findings were without support in the evidence and that the Board's order requiring the respondent to withdraw recognition from and to disestablish the Association as the collective bargaining agency of its employees was an abuse of discretion and contrary to the policy of the act. It accordingly vacated the order of the Board and denied the Board's petition for enforcement. We turn immediately to the facts of the case and the Board's findings.

Respondent does a general telephone business in nine southeastern states, furnishing local and long distance communication facilities, both interstate and intrastate. It has 23,000 employees and 1,375,000 subscribers.

The Association was organized in 1919 by respondent Company to represent its employees as a labor organization and admittedly until July 5, 1935, the date of the passage of the National Labor Relations Act, respondent liberally contributed support to the Association. The factual center of controversy here, resolved by the Board against the respondent, is whether this domination and interference came to an end with the reorganization of the Association in the spring and summer of 1935 or at any later date before the complaint. Another act of disassociation is alleged by respondent to have taken place on February 14, 1941.

There is testimony that in April and May, 1935, just before the passage of the National Labor Relations Act, the Association's president, Askew, in anticipation of the passage of the act, successfully canvassed the membership for fifty cent contributions so that the Association would have its own funds and be able to operate after the bill became a law. The Company aided the solicitation with advice, automobile transportation and expenses for the solicitors. Over five thousand dollars was raised. Three Association officials actively engaged in the fund

raising. Askew, the President, Weil, the vice-president and soon to be president, and Wilkes, the acting treasurer, were employees having close touch with the company management. Askew was a state cashier, Wilkes was secretary to key officials and Weil, plant practice supervisor, a position described by him as covering the distribution and explanation to the proper employees of printed routine job instructions.

On July 16, 1935, immediately after the passage of the Labor Act, Warren, respondent's vice-president in charge of operations, called a meeting of his chief supervisory employees, attended by Askew and Wilkes as Association officers. At this meeting the Wagner Act was discussed and a "hands-off" policy announced by the Company as to the organization of its workers. The supervisory employees were instructed to and did transmit these views down to the ranks by word of mouth, superior supervisors speaking to their inferiors. No mention was made at this meeting of the disestablishment or dissolution of the Association. A few days later a memorandum on the "Wagner Bill Interpretations" was issued by the Company and called to its employees' attention. It read as follows:

"The Company can continue to pay salaries of Association officers who are filling their regular jobs and doing Association work incidental to their regular duties.

"The Company can continue to pay the salaries of Association officers while engaged in conferring with Management and while they are meeting among themselves before or after these conferences to discuss their presentation or disposition of the matters involved. Salaries cannot be paid when Association officers are devoting their time solely to internal affairs of the Association.

"The Company cannot pay traveling expenses. However, all Management Representatives are anxious to cooperate and will endeavor to meet Association officers

at such times and places as will be most convenient and economical.

"The Association may continue to use Company premises for their meetings without charge. Space for the exclusive full time use of the Association could not be provided without proper charge.

"Association Local meetings cannot be held on Company time.

"The Association may use Company typewriters and other office facilities when such is incidental to the regular Company use of these facilities. Out-of-pocket expenses such as stamps, stationery and supplies cannot be borne by the Company.

"Association Representatives may make limited use of toll lines upon the same basis as is effective for employees generally.

"The expense of preparation and distribution of the Minutes of Joint Conferences will be borne by the Company."

This memorandum was revised in accordance with the Company's views of developments in the interpretation of the National Labor Relations Act. The most significant changes occurred in the revision of April 1937 when the paragraph as to salaries was changed to read:

"1. The Company can pay salaries of association officers while engaged in conferring with Management. The Company cannot pay salaries of association officers under the following conditions:

"(a) While they are meeting among themselves before and after joint conferences to discuss their presentation or disposition of the matters involved.

"(b) While association officers are devoting their time solely to internal affairs of the association."

In that issue, it was made clear that the Association must pay for services rendered by the Company, such as

space, long distance calls and collection of dues. The memorandum concluded:

"The provisions of this Act make it illegal for an employer to dominate or interfere with the formation or administration of any labor organization, and the Management of this Company should conscientiously observe these provisions."

No disestablishment of the Association as the representative of the employees in their negotiations with the management appears from this evidence and the Board found none.

Respondents urge that the historical continuity between the Company organized and financed employee association of 1919 to 1936 and the reorganized association of 1936 to date is not controlling in determining whether the Association was dominated by the Company in 1941. There was certainly sufficient evidence of continuity to form a basis for the Board's conclusion that the reorganization did not so completely displace the original association as to amount at that time to the creation of a "free and uninspired" employee agency. The reorganization was guided by the principal officers of the existing association. The vice-president of the old became the president of the new. Two of these active reorganizers continued in the higher offices of the Association through 1939. A new agreement with the Company, which for the first time provided for a check-off for association dues, was negotiated before the ratification of the changes in the association constitution, which were made in an attempt to conform to the National Labor Relations Act. The reorganization proceeded by revision rather than by original creation. Members were ineligible for election to offices in locals until a year from their admission and to the presidency until five years. In asking for new applications for membership, it was explained by the Association that it would provide a complete record of

membership "and it is not to be considered as a new application for membership." Until the March 1940 meeting, the preamble of the revised constitution referred to the formation of the Association in 1919. At that date, the preamble was changed so that it recited the date of the formation to be August 30, 1935.

The revision of the constitution was important from the standpoint of the Labor Act. The Company could no longer properly pay the expenses of the Association. Consequently the membership had to pay dues to meet the expenses. These changes were made.

Even though this continuity of the employee organization as a matter of law may not be controlling as to the continuance of dominance by the Company, it is at least evidence of such dominance, entitled to consideration by the Board. The effects of long practice persist. Notwithstanding freedom from labor difficulties, the disestablishment of an employee organization may be necessary to give untrammelled freedom for the creation of a bargaining unit. *Labor Board* v. *Greyhound Lines,* 303 U. S. 261, 271; *Labor Board* v. *Newport News Co.,* 308 U. S. 241, 250; *Westinghouse Electric & Mfg. Co.* v. *Labor Board,* 112 F. 2d 657, 660, affirmed 312 U. S. 660.

So much the respondents concede, or at least assume. They agree that a cleavage is necessary but they deny that the Board may decide that all that happened between the passage of the Act in 1935 and the issuance of the complaint in 1941 does not overcome the lawful domination prior to the enactment of the Act. Formal disestablishment is not, the Company says, the only act which will comply with the law and the evidence after the passage of the Labor Act shows without contradiction, so the respondents contend, that the Company was neutral and the Association the choice of the employees.

The Board called attention to minor favors shown the Association after 1935 by the Company. The use of a

Company bulletin board to post association notices, the limited use of employer space or facilities, the deduction of dues without charge, all without discrimination between employee organizations and prior to administrative and judicial clarification of the Labor Act, may be of little importance but they are a part of the circumstances from which the Board is to draw conclusions.

There is also evidence that in 1940 a long distance supervisor at Shreveport, Louisiana, at a superior's suggestion, undertook to influence two subordinates to favor the Association against the efforts of an outside union to secure members. While only a single incident, it is entitled to consideration by the Board.

The respondents' evidence shows further that when an outside union sought members among the Company employees and while the Labor Board was investigating charges of Association dominance by the Company, the Association wrote the Company in part as follows:

"Because such a charge clouds this Association's right to represent the employees of the Company and that under such circumstances the best interests of the employees may not adequately be served, the Association will not undertake to act as their collective bargaining agent pending a canvass of its membership by signed ballot."

Immediately the Company on February 14, 1941, posted notice to its employees which quoted §§ 7 and 8 of the Labor Act and then added:

"The Company Recognizes Its Employees' Right to Join, Form or Affiliate With Any Labor Organization of Their Own Choice and Freely to Exercise All Rights Secured to Them by This Act.

"The Company Guarantees Its Strict Compliance With All the Provisions of This Act and That No Employee Will Be Discriminated Against or Suffer Any Other Penalty Because of His or Her Exercise of Any Right Secured by This Act.

"The Company Is Not Interested in Whether Its Employees Join or Do Not Join Any Labor Organization." Thereafter, by means of a signed ballot poll, a majority of the employees indicated their desire to continue their membership in the Association and their choice of the Association as their representative for collective bargaining. Pending the poll, the Company continued in effect its 1940 agreement with the Association. After the poll and subsequent to a certification to it of the manner of voting and the result, the Company on March 6, 1941, recognized the Association as the "authorized collective bargaining agent of the employees of this company." The same agreement continued to govern the relations between the Company and the Association until the present hearing.

The respondents' evidence shows also that in the years 1936 to 1940, inclusive, the Association represented the employees in bargaining conferences over wages, hours and working conditions. Out of these conferences came substantial concessions to the employees, estimated by witnesses as worth more than three million dollars annually to the employees.

From the group of circumstances heretofore detailed in this opinion, the Board concluded that the Company had continued to countenance the Association. It held that:

"The effect of the domination and support of the Association by the respondent prior to and during the years since 1935, could not, under the circumstances, be dissipated except by an explicit announcement to the employees that the respondent would no longer recognize or deal with the Association. In the absence of such action by the respondent, its employees were not afforded the opportunity to start afresh in organizing for the adjustment of their relations with the employer which they must have if the policies of the Act are to be effectuated."

We are of the opinion that there was substantial evidence to justify this conclusion. Since the Association prior to the passage of the National Labor Relations Act in 1935 was obviously a company-dominated and supported union, the question of the weight to be given the passage of time or subsequent efforts to dissipate the effect of this early domination is for the Board. Its conclusion is an inference of fact which may not be set aside upon judicial review because the courts would have drawn a different inference. *Labor Board* v. *Greyhound Lines,* 303 U. S. 261, 270; *Labor Board* v. *Falk Corp.,* 308 U. S. 453, 461.

Management control over company-sponsored employee organizations runs the entire scale of intensity. It may be slight or complete. A genuinely free union composed of employees of one corporation alone may satisfy the requirements of § 7 but where, as here, evidence exists of original employer interference, the Board may appraise the situation and even forbid the appearance of such a union on the ballot to select bargaining representatives where in the Board's judgment the evidence does not establish the union's present freedom from employer control. *Labor Board* v. *Falk Corp., supra,* 461, 462. In the present case the Board ordered the Company to completely disestablish the Association as bargaining representative and to cease and desist from giving effect to the contractual arrangements resulting from the Association's former representation of the employees. For the reasons given this order was, in our opinion, within the discretion of the Board.

The order of the Circuit Court of Appeals is reversed and the cause is remanded to that Court with instructions to enforce the order of the Board.

*Reversed.*

Mr. Justice Roberts took no part in the consideration or decision of this case.