NATIONAL LABOR RELATIONS BOARD
v. TAPPAN STOVE CO. (INDEPENDENT EMPLOYEES ASS'N, Intervener).

No. 10798.

United States Court of Appeals
Sixth Circuit.

June 3, 1949.

Ruth Weyand, Washington, D. C. (David P. Findling, A. Norman Somers and Irving M. Herman, Washington, D. C., on the brief), for petitioner.

J. H. Gongwer, Mansfield, Ohio, and Maurice F. Hanning, Cleveland, Ohio (J. H. Gongwer, Mansfield, Ohio, and Maurice F. Hanning, Cleveland, Ohio, on the brief), for respondent.

Daniel E. Bevis, Columbus, Ohio (Daniel E. Bevis, Columbus, Ohio, on the brief), for intervenor Independent Employees Ass'n.

Before SIMONS, ALLEN and MARTIN, Circuit. Judges.

MARTIN, Circuit Judge.

 This is another petition of the National Labor Relations Board for enforcement of its order in. the consideration of which we must constantly bear in mind that, though not in accord with the board's decision, we are impelled to enforce it if upon consideration of the record as a whole it is apparent that the board's findings are supported by substantial evidence. Title 29, U.S.C.A. § 160(e). The Supreme Court has repeatedly admonished the courts' of appeal as to their limited power of review of fact findings of the labor board.

See for example authorities cited in S. H. Camp & Co. v. National Labor Relations Board, 6 Cir., 160 F.2d 519, 522, and in National Labor Relations Board v. Thompson Products, 6 Cir., 130 F.2d 363, 367, 368. In the matter of factual review, the Taft-Hartley Act, 29 U.S.C.A. § 141 et seq., merely broadened the Wagner Act, 29 U.S.C.A., 151 et seq., to the extent that the findings of fact of the National Labor Relations Board must now be based upon substantial evidence rather than upon evidence unqualified by the adjective "substantial"; and that determination of issues. of fact must be reached upon consideration of the record as a whole.

The board order under present review directed the respondent, The Tappan Stove Company, to cease and desist from (1) domination or interference with the Independent Employees Association of The Tappan Stove Company, or any other organization of its employees; (2) from recognizing the Independent Employees Association, or any successor thereto, as the representative of its employees concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of employment; (3) from giving effect to any and all agreements and contracts with the Independent Employees Association; (4) from recognizing or dealing with any other labor organization as the representative of its employees concerning wages and other conditions of employment unless and until such labor organization shall have been certified by the board as such representative; and (5) from encouraging membership in the Independent Employees Association, or any other labor organization of its employees, and discouraging membership in the United Electrical, Radio & Machine Workers of America, affiliated with the C.I.O., or any other labor organization of its employees, by discharging any employee pursuant to any contractual provision requiring, as a condition of employment, membership in any labor organization which has been established, maintained or assisted by any action defined in the Act of Congress as an unfair labor practice, or in any successor thereto, or in any labor organization which has not been certified by the board.

The respondent was ordered to take affirmative action, as follows: (1) to withdraw all recognition from and completely disestablish the Independent Employees Association as representative of its employees, and to refrain from recognizing the several relations committees should The Tappan Mutual Benefit Association, or The Tappan Stove Company Employees' Association, return to active existence; (2) to offer to four named employees, Sposito, Kellogg, Wolford and Heppinger, immediate and full reinstatement to their former or substantially equivalent positions without prejudice to their seniority, or other rights and privileges; (3) to make them whole for any loss of pay occasioned by respondent's discrimination against them; (4) to post appropriate notices; and (5) to notify the regional director of compliance with the board's order.

The record reveals a long history of friendly labor relationship between the respondent and its employees. As far back as 1895, to alleviate distress among its members by an insurance plan, The Tappan Mutual Benefit Association came into existence. Its membership embraced management employees, as well as employees generally. In 1926, this organization was revitalized so as to afford the employees a voice in the practical running of the plant. Six committees were constituted to deal, respectively, with safety, fire prevention, recreation, improvements, loss and waste, and grievances. The chairmen of these committees were chosen by the membership of the Mutual Benefit Association, with the participation of the management. Each chairman chose the six members of his committee, one from each of the voting groups into which the plant was divided. The benefit association still exists and operates, and five of the six committees remain unchanged. The sixth, the relations committee which concerned itself with grievances, has been supplanted by the welfare committee. During the time that the relations committee was embraced within the Mutual Benefit Association, it served as a representative of the employees in dealing with the respondent company concerning wages, hours and working conditions. The meetings were held on the company premises and, while attending them, the committeemen were paid by the company. The chairmanship of the relations committee was sometimes held by a foreman, and the membership of the committee included both workers and "bosses."

After it became apparent from the decision of the Supreme Court in National Labor Relations Board v. Jones & Laughlin, 301 U.S. 1, 57 S.Ct. 615, 8 L.Ed. 893, 108 A.L.R. 1352, that the relations committee was an illegal organization, the respondent in May, 1937, caused its attorney, Veach, to address that committee—together with a group of foremen—as to the legal situation resultant from the Wagner Act. This meeting was attended by two of the Tappans. The testimony of the various witnesses as to what the attorney said is not too clear. This would be natural, in view of their attempt to recall his remarks after some seven years. It is clear, however, that Veach told the group that the committee could no longer meet on company property; but he did not make it plain that the committee must be abolished. Along this line, the extent of his remarks seems to have been that the company could have no further dealings with the relations committee "as it was at that time." At least one witness understood that the company could deal with the relations committee on company property when the committee came with a grievance. Another witness testified that Veach said that the relations committee had to hold its meetings "outside the shop from then on," and would have "to get a new committee."

Those who listened to the lawyer's speech were told to explain the Wagner Act to the other employees. The gist of Veach's remarks became general knowledge around the plant, but the respondent company posted no notice on the bulletin board and directed no specific communication to its employees advising them that it could no longer deal with the relations committee. At the conclusion of Veach's remarks, the relations committee retired to another room to discuss a course of action. With Craig, foreman of the experimental engineering department, acting as chairman, it was decided to pass for signature among the employees of the company an accept-

ance of the relations committee as their representative. By reason of his close relationship to management, Craig resigned from the committee and induced another member, King, to resign for the same reason. Craig convinced Wilhelm that "for the good of the people" the latter should take over the chairmanship of the relations committee.

With neither aid nor interference from the respondent, lists bearing the suggested slate for membership on the relations committee were circulated by employees on the sidewalk outside company premises. Gross, a member of the relations committee, was stopped from circulating a list on the premises of the company after he had obtained about eight signatures in the shop. At the "next regular meeting" of the relations committee, held off company property, the lists which had been circulated were tabulated with the result that the suggested committeemen were approved by the signatures of 186 of the 333 eligible employees. Wilhelm was elected chairman by the relations committee, which continued to deal with the company in very much the same fashion as it previously had done, except that meetings were not held in the factory and no officials were present.

Until April, 1938, the membership of the committee remained unchanged, except as to successors to Wilhelm and King. Wilhelm was then reelected chairman. Until 1939, the relations committee did not represent any organized group, but took up grievances for anyone in the plant except the moulders, who had a separate union. In the annual general meeting of that year, held in April, Farley was elected chairman. The small expenses of the committee having been paid by the committeemen out of their own pockets, it was resolved that the members thereafter should be charged dues of fifty cents a year. There was discussion of obtaining a constitution, but nothing was done about it until the meeting held in December, when the membership decided to have a constitution drafted. Farley felt himself incompetent to perform this service, and it was thought that legal advice was needed and that an attorney should be employed.

After turning down the attorney's first draft, the committee accepted one which he modeled on that of the local bar association. The preamble to this document recited that The Tappan Stove Company Employees Association (the new name adopted) had existed as a relations committee since 1926, and that the membership believed that "it would be to the best interests of said association to have the rules and regulations under which said association had been operating during said period of time, written into a formal constitution." This constitution was ratified by signatures of the members of the association, who subscribed it outside the company's premises. Though the constitution was ratified early in 1940, there was no new election of officers until April. Membership in the new association was open to any employee of the company, except officers, directors, superintendents, foremen and supervisors. Although there is no evidence that the company knew he was so doing, one of the committee members, Linn, who subsequently switched his allegiance to the C.I.O., collected dues from members on company property, and during working time for which he was being paid by the company

In 1941, the association employed an attorney upon a retainer basis. Desiring an independent union, the association, upon advice of this attorney, amended its constitution in November or December of 1941, and changed the name of the organization to the Independent Employees Association of The Tappan Stove Company. The governing body, increased to seventeen members, was still called the "relations committee," as had been the case under the old association. Again, there was no election of officers at the time the new constitution was ratified; and the same employees retained their offices until a general meeting of the membership was held in a local park in April, 1942.

In order to fill vacancies on the committee in 1943, slips of paper for nomination were distributed among members during working hours. The record discloses that all employees did not understand the character of the various changes in their organization. A former member of the rela-

tions committee testified that he could not recall when the "slight change in the name" of the association to the Independent Employees Association had occurred. Confusion existed in 1943 as to who was eligible to membership in the Independent Employees Association, as evidenced by the fact that dues were collected from some employees who were later declared ineligible for membership. In one election, a supervisor, Banks, was nominated for office in the association through misunderstanding as to his eligibility. From the record, it appears that the management of the company was not consulted concerning the changes in the employee-organization's constitution, made no suggestions, and had nothing whatever to do with making the constitution.

In the summer of 1943, the C.I.O. inaugurated a campaign for membership among the employees of respondent; and, on several occasions over a two months' period, passed out handbills outside the company premises. Some, but not many, of the employees joined it. The efforts of the C.I.O. became known to both respondent and the Independent Employees Association. Linn testified that Durig, a superintendent in the press shop under whom he had worked for seven years, told him and two or three other employees that if they "would exert as much effort and get behind the IEA" as they had the C.I.O. they might "get some place with it," and that they "ought to give it a trial." Loch, another employee, testified that the foreman of the foundry told him that if the C.I.O. got in all their "small privileges would be cut out, such as smoking." Sposito, an employee who joined the C.I.O., testified that a "boss" under whom he worked told him that the C.I.O. "was a no good organization."

In the fall of 1943, the Independent Employees Association made its first demand upon respondent for a contract. According to Farley, this demand was made because the association had obtained all it could get and had reached "the top levelling off point." He explained that the contract was desired so as to retain the benefits which the employes had obtained, such as increased and established rates of pay and profit sharing. The association had its friends "scout around" to find copies of labor contracts from which could be obtained provisions for insertion in the contract to be demanded of respondent.

The company declined to enter into a contract with the Independent Employees Association without being assured that it represented the majority of the employees. A firm of independent accountants, selected by the association, was employed to check the association membership cards against payroll cancelled checks. The audit report of these accountants certified that the signatures on 437 membership cards (there being then 516 employees eligible for membership) were those of the persons named on the cards. The checking by the auditors was done in the company offices, but the company did not participate in the check-up, except to answer questions asked by the accountants, and it accepted the accountants' report without question.

Negotiations between the respondent and the association, in respect of a collective bargaining agreement, were begun early in December, 1943. Numerous meetings ensued, and a contract was signed on January 17, 1944. Evidently, pink tea was not served at the sessions of management and the association representatives in their effort to reach a mutually satisfactory bargaining agreement. Farley testified that some very serious disagreements arose. When "everybody got mad," the meeting was "postponed"; and the negotiators waited until they were in a good humor to meet again. He recalled that, on one occasion, Superintendent Lamb "just about ordered us out of his office" and said that the company would run its own business.

In the end, a maintenance of membership clause was included in the contract, but the demand by the association for a check-off of dues was rejected, as was, likewise, the demand for an office on the company premises. The company, however, later did arrange a small glass-enclosed room in its plant for the use of the association. The name "Independent Employees Association" was printed on the door of the room and this office was used by it until August, 1944, when it rented headquarters

outside the plant. The contract contained provisions for bonuses, profit sharing, vacations, and a voice by the association in the selection of foremen and supervisors.

The contract provided that all eligible employees then members of the association in good standing and all employees subsequently becoming members should "as a condition of continued employment" remain members of the association in good standing for the duration of the contract. Each member of the association at the time, however, was granted fifteen days from the effective date of the contract to decide whether he desired to remain a member.

On July 17, 1944, notice in writing was delivered to the company by the association certifying that twenty named persons who were members of the association when the contract was signed were not members in good standing upon the date of the notice. These twenty persons had not withdrawn their membership in the association during the fifteen-day period of grace. Sixteen of the individuals listed restored themselves to good standing in the association, but four of them—Sposito, Kellogg, Wolford, and Heppinger—refused to do so and were discharged by the respondent on July 22, 1944.

In the interim between the signing of the contract and the discharge of the four above-mentioned employees, who were ordered reinstated by the labor board, the association, on advice of counsel, amended its constitution so as to set up an executive committee of seven members. It was provided that collective bargaining should be conducted by the members of the executive committee and association group representatives, to be elected as prescribed. This action was taken for the reason that the relations committee had grown to a membership of twenty-two or twenty-three committeemen whose work was scattered through the twenty-four hours of the day, making it "almost impossible to call a meeting and get all there."

The labor board adopted the findings, conclusions and recommendations of the trial examiner contained in his intermediate report, except with conditions and qualifications none of which weakened adherence.

To the contrary, the decision of the board emphasized the continuity of direct relationship between the Independent Employees Association and the original relations committee, which was found to have been dominated and assisted by respondent, but never disestablished by it.

The trial examiner found that respondent never unequivocally told the relations committee of the Mutual Benefit Association on May 13, 1937, that the relationship theretofore existing between it and the committee was being completely severed; that it never conveyed directly to the employees as a whole its intention of no longer recognizing or meeting with the committee; and that the employees were not advised clearly by the committeemen that the respondent's relationship with them had been discontinued, or that the company would refuse to deal further with the committee.

The report points out that, for eleven months after May, 1937, when the respondent contends it disestablished the committee, the respondent continued to recognize the committee and to permit its operations within the plant; that the relations committee as it existed after May, 1937, was a continuation of that committee; and that in the minds of the employees the relations committee was unchanged in structure and function. The examiner regarded as most significant the fact that, in the making of the various changes, action was on each occasion suggested by the committee which secured the approval of the employees to each change and thereafter, without new elections, remained in office until the following annual election.

In its decision, the labor board emphasized the proposition that the Independent Employees Association was merely a successor to, or continuation of, the relations committee. The board thus discussed the absence of fracture: "In a situation of this type, our first inquiry is whether or not the labor organization which purports to act as the employees' bargaining agent is a successor to or a continuation of the labor organization dominated and assisted by the employer. For the effect of an employer's coercion inherent in the mainten-

ance of a dominated union ordinarily survives the illegal organization. To dispel this coercive effect, if a succeeding organization is set up, there must be a complete break or fracture between the two organizations. No such fracture between the Independent and the dominated Relations Committee of the TMBA has ever occurred. The Relations Committee of the TMBA was never disestablished by the respondent. It is also clear that the Independent was not a new labor organization distinct from the Relations Committee of the TMBA, but was merely a successor to or continuation of the Relations Committee of the TMBA."

The board declared that, upon the entire record, it was satisfied that the respondent and the Independent were influenced in their decision to sign a contract by the organizational activities of the C.I.O. union, and that the purpose of the contract was to strengthen the position of Independent and to frustrate its rival's attempt to organize. The board stressed the fact that, by executing a maintenance of membership contract with Independent at a time when the union was attempting to organize the employees, respondent rendered valuable assistance and support to Independent and further demonstrated its approval of that organization as the employees' bargaining representative. It was held that respondent's conduct and activities constituted unfair labor practices within the purview of the Act.

■ In our judgment, we must enforce the order of the labor board upon the binding authority of the Supreme Court's opinion in National Labor Relations Board v. Southern Bell Telephone & Telegraph Co., 319 U.S. 50, 63 S.Ct. 905, 908, 87 L.Ed. 1250. In that case, denial by the court of appeals of the board's petition for enforcement of its order was reversed, it being held that there was substantial evidence to support the conclusion of the board that an association of employees, which prior to the passage of the National Labor Relations Act was a company dominated and supported union, had not ceased to be such, despite reorganization of the association and subsequent efforts to dissipate the effect of such early domination.

Marked similarity is found between the facts disclosed in this case and the factual setting described by the Supreme Court in the Southern Bell Telephone & Telegraph case. There, after the Wagner Act became law, the company, at a meeting of the foremen and the officers of the old organization, announced a hands-off policy toward an association of its employees organized in 1919 and company dominated. Notice was given of required changes in its manner of operation and changes necessary to be made were enumerated, but disestablishment was not required. Only small favors were subsequently bestowed upon the association, such as being permitted to use the company's bulletin board. The reorganization continued to be guided by the principal officers of the old association, who were close to management; and, as stated by the Supreme Court: "The reorganization proceeded by revision rather than by original creation." The constitution of the new association made reference to the formation of the association in 1919. The company in that case went farther than did the respondent in the instant case in the pronouncement of neutrality when the C.I.O. began a membership drive among its employees. It posted on its bulletin board an express notice of its neutrality, while here respondent gave no such formal notice.

Among other significant statements in the opinion of the Supreme Court, the following should be especially noted: "There was certainly sufficient evidence of continuity to form a basis for the Board's conclusion that the reorganization did not so completely displace the original association as to amount at that time to the creation of a 'free and uninspired' employee agency. The reorganization was guided by the principal officers of the existing association. * * * Even though this continuity of the employee organization as a matter of law may not be controlling as to the continuance of dominance by the Company, it is at least evidence of such dominance, entitled to consideration by the Board. The effects of long practice persist. Notwithstanding freedom from labor difficulties, the disestablishment of an employee organization may be necessary to

1014

give untrammeled freedom for the creation of a bargaining unit. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 576, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Newport News [Shipbuilding & Dry Dock] Co., 308 U.S. 241, 250, 60 S.Ct. 203, 208, 84 L.Ed. 219; Westinghouse Electric & Mfg. Co. v. National Labor Relations Board, 2 Cir. 112 F.2d 657, 660, affirmed 312 U.S. 660, 61 S.Ct. 736, 85 L.Ed. 1108."

The Supreme Court stated that there was substantial evidence to justify the conclusion of the labor board, which was quoted as follows: "The effect of the domination and support of the Association by the respondent prior to and during the years since 1935, could not, under the circumstances, be dissipated except by an explicit announcement to the employees that the respondent would no longer recognize or deal with the Association. In the absence of such action by the respondent, its employees were not afforded the opportunity to start afresh in organizing for the adjustment of their relations with the employer which they must have if the policies of the Act are to be effectuated."

The Supreme Court asserted that since the association, prior to the passage of the National Labor Relations Act of 1935, was obviously a company dominated and supported union; "the question of the weight to be given the passage of time or subsequent efforts to dissipate the effect of this early domination is for the Board"; and its conclusion is "an inference of fact which may not be set aside upon judicial review because the courts would have drawn a different inference." The order of the board directing the company to completely disestablish the association as bargaining representative and to cease and desist from giving effect to the contractual arrangement resulting from the association's former representation of its employees was held to be enforceable, it being said to be within the discretion of the board to issue such an order.

Among other Supreme Court opinions which we think indicate that the order of the board in the instant case should be enforced is National Labor Relations Board

v. Falk Corporation, 308 U.S. 453, 461, 60 S.Ct. 307, 84 L.Ed. 396. Another guiding authority is Westinghouse Electric & Mfg. Co. v. National Labor Relations Board, 2 Cir., 112 F.2d 657, 659, which was affirmed, per curiam, in 312 U.S. 660, 61 S.Ct. 736, 85 L.Ed. 1108 and was cited with approval in the Southern Bell Telephone & Telegraph Company opinion, supra, 319 U.S. at page 57, 63 S.Ct. 905, 87 L.Ed. 1250.

In National Labor Relations Board v. Thompson Products, 6 Cir., 130 F.2d 363, 368, this court pointed out that "the test, whether a challenged organization is employer controlled, is not an objective one but rather subjective, from the standpoint of employees." Cf. International Association of Machinists v. N.L.R.B., 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50; N.L.R.B. v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368. This comment seems directly applicable here.

The petition of the National Labor Relations Board for enforcement of its order is granted.