**DEPARTMENT STORE FOOD CORP. OF PENNSYLVANIA, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**RETAIL CLERKS INTERNATIONAL ASSOCIATION, LOCAL 1538, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 17413, 17476.**

United States Court of Appeals
Third Circuit.

Argued June 12, 1969.

Decided Sept. 10, 1969.

---

Arnold T. Olena, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N. Y., for Department Store Food Corp. of Pa.

Joseph E. Finley, Metzenbaum, Gaines, Krupansky, Finley & Stern, Cleveland, Ohio, for Retail Clerks International Assn., Local 1538, AFL–CIO.

Angelo V. Arcadipane, N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Leonard M. Wagman, Attys., N. L. R. B., on the brief), for respondent.

Before STALEY, FREEDMAN and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

STALEY, Circuit Judge.

We are to decide whether the National Labor Relations Board was warranted in concluding that the Department Store Food Corporation of Pennsylvania (hereinafter "Company") violated Section 8 (a) (2) and (1) of the National Labor Relations Act [1] by unlawfully assisting and supporting the organizational efforts of Local 1538, AFL–CIO, of the Retail Clerks International Association (hereinafter "Union").[2] Both the Com-

---

1. Section 8(a)(1) and (2) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(a)(1) and (2), provides:

    "(a) It shall be an unfair practice for an employer—

    (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

    (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it * * *."

2. The Board also determined that the Company violated Section 8(a)(2) and (1) by recognizing the union represented as exclusive bargaining agent at a time when the union represented only a minority of employees and was not the freely designated bargaining representative of the workers, and additionally violated the Act by executing a security agreement with the union. Because these additional violations stand or fall on the validity of the Board's initial determination that the Company illegally assisted and supported the union's organizational operation, we have confined our analysis to this first and basic point. The Board's decision and order are reported at 172 N.L.R.B. No. 129.

pany and Union have joined in filing for review of the Board's decision and order, and the Board has filed a cross-application for enforcement.[3]

The following facts are based on substantial evidence on the record as a whole. The Company operates a leased retail meat and grocery establishment located in a department store in Sugar Creek Township, Pennsylvania. The incidents giving rise to these proceedings took place prior to the public opening of the store on August 22, 1967. During the month of July, the Company had interviewed job applicants who had responded to a help-wanted newspaper advertisement and had notified successful applicants to report for employment processing. One of these, John Travis, then employed as a meat manager at a nearby store, had applied for a position at the request of the Union which had enlisted his aid in organizing the new operation on its behalf.

Armed with a supply of union authorization cards, Travis began work on July 31. On August 7 and 8, three separate groups of new female cashier trainees previously hired by the Company reported for work. The same checking-in procedure was followed with each group. At the office Albertine Carlson would give the new employee an employment form to be completed at a position a few feet away and returned to the office. When the employee returned with the completed form, Carlson, who also worked as a cashier instructor for the Company and who knew Travis from a former employment, would inform the employee that a man "over there" (pointing to Travis who had set up a table in the aisle of the as yet unopened store) wanted to see her.

Without mentioning the name of the Union, Travis invited each employee sent by Carlson to sign a union authorization card authorizing Retail Clerks to be the signatory's collective bargaining agent. It appears that each new employee

signed the authorization card without hesitation and without significant inquiry, and that some did not know the name of the union; still others did not read the card before signing. Indeed, it seems they signed the cards in the same matter-of-fact manner as they had previously completed the employment applications that Carlson gave them. And, after they finished signing, they returned to Carlson for further instructions.

By the afternoon of August 8, Travis· had obtained 53 or 55 signed cards; assistant grocery manager Kertcher had solicited signed cards from the remainder of the 58 persons employed on that date. On the basis of these 58 cards, the Company, on August 8, recognized the Retail Clerks as the exclusive bargaining representative of its employees, and on August 15 the Company and Union executed a collective bargaining agreement covering all store employees except the store manager and co-manager. The contract contained union security and checkoff provisions.

The day before this agreement was executed, on August 14, another union, the Amalgamated Meat Cutters and Butcher Workers of North America, AFL–CIO, Amalgamated Food Employees Union Local 590, filed charges with the Board after the Company had apparently spurned requested negotiations for the same employees already recognized by the Company as represented by the Retail Clerks.

From the foregoing facts, the trial examiner inferred, and the Board agreed, that under the circumstances, the newly hired employees could reasonably believe that the signing of the authorization cards was just as much an integral part of the checking-in process and a condition of employment as the filling out of the employment applications. Thus, the Board concluded that the Company violated Section 8(a) (1) and (2), because its subtle coercion de-

3. Although the Board's order is somewhat detailed, its basic provision is that the Company must withdraw and withhold

all recognition from the Retail Clerks unless and until the Board shall certify it as a collective-bargaining representative.

prived the employees of the "complete and unhampered freedom of choice which the Act contemplates." International Association of Machinists, etc. v. NLRB, 311 U.S. 72, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50 (1940).[4]

■ In reviewing the Board's decision and order, it is well settled that despite what we would decide were we to review the evidence de novo, we must sustain the Board's conclusions if they are rational and reasonably inferable from the evidence. NLRB v. Southern Bell Telephone & Telegraph Co., 319 U.S. 50, 63 S.Ct. 905, 87 L.Ed. 1250 (1943); Dixie Bedding Manufacturing Co. v. NLRB, 268 F.2d 901 (C.A. 5, 1959); Berkshire Knitting Mills v. NLRB, 139 F.2d 134 (C.A. 3, 1943), cert. denied, 322 U.S. 747, 64 S.Ct. 1158, 88 L.Ed. 1579 (1944); NLRB v. Sun Shipbuilding & Dry Dock Co., 135 F.2d 15, 25 (C.A. 3, 1943). And where, as here, we are in agreement that substantial evidence supports the Board's findings, our scope of review is limited to determining whether the Board's factual inferences are so irrational they cannot stand, and whether, if they stand, they justify the Board's order. Independent Employees Ass'n of Neptune Meter Co. v. NLRB, 158 F.2d 448 (C.A. 2, 1946), cert. denied, 333 U.S. 826, 68 S.Ct. 448, 92 L.Ed. 1112 (1948).

■ After carefully examining the entire record, we think that the Board's conclusions are reasonable and that the order is justified. One need not be learned in the behavioral sciences to know that when a newly hired employee reports for her first day of work, she will ordinarily be anxious to favorably impress her new employer and to readily acquiesce in work-related requests. Due to Carlson's location in the Store Manager's office and her ostensible position as the Company's representative in charge of checking-in procedures and cashier instruction, it was reasonable for the Board to conclude that when Carlson sent the girls to Travis nearby, they reasonably believed that, as a condition of employment and as part of the checking-in process, the Company wanted them to sign the authorization cards which Travis proffered. Similarly, it was also reasonable to conclude that the Company's assistance in this regard impaired the employees' right to freely choose whether or not they wanted to join the Union. Certainly, it cannot be seriously argued that if a new girl wanted a position with the Company, and she believed that the signing of an authorization card was a condition of employment, she nevertheless had the option to refuse to designate the Union as her bargaining agent.[5] Cf. NLRB

4. We reject at the outset petitioners' contention that this case can be solved by the application of a strict numbers game. Petitioners contend that the evidence adduced at the hearing shows that no more than 26 employees could have been subjected to the checking-in procedure a la Carlson-Travis-Carlson, and therefore, assuming without conceding these signatures to be invalid, the remaining 32 signatures unaffected by the charge were sufficient to give a numerical majority to the union (out of a total of 58 employees).

We see no valid reason to restrict the Board to a mathematical approach in evaluating the effect of employer conduct on the organization of a labor union. Instead, we accept the analysis of the Fifth Circuit in NLRB v. Clement Bros. Co., 407 F.2d 1027 (C.A. 5, 1969), where it held that it was appropriate for the Board to consider the numerical evidence

as supportive of other permissible inferences; that, if certain of the votes were tainted, this was appropriate circumstantial evidence for the fact finder to conclude that other votes could be suspect as well.

Thus, assuming the Company to be correct in asserting that less than a majority of the employees were "coerced" by the checking-in procedure, this does not mean that the Board is precluded from inferring that such coercion tainted whatever numerical majority the Retail Clerks may have obtained.

5. To avoid any misunderstanding we hasten to state that our decision to enforce the Board's order can in no way be construed as evincing a negative attitude toward the use of authorization cards. See N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). It was not the use of the cards

v. Keller Ladders Southern, Inc., 405 F.2d 663 (C.A. 5, 1968); Dixie Bedding Manufacturing Co. v. NLRB, supra.

We realize, of course, that other courts have refused to approve the Board's finding of unlawful assistance in factual situations that may appear to be more egregious than here, see e. g., Continental Distilling Sales Co. v. NLRB, 348 F.2d 246 (C.A. 7, 1965); Chicago Rawhide Manufacturing Co. v. NLRB, 221 F.2d 165 (C.A. 7, 1955);[6] but under our constricted scope of review, once we have determined that the Board's conclusions are reasonable, we are not permitted to displace them with contrary and perhaps more reasonable ones. We also realize that cooperation between management and labor is to be judicially encouraged at every opportunity, but when management and labor join hands at the expense of employee rights, we have just as much an obligation to support the Board in the vindication of those rights.

Accordingly, the order of the Board will be enforced, and a form of decree may be submitted.

that created the problem here, but rather the Company's interference with the employees' right to freely choose whether or not to sign them.

6. For a compilation of cases pro and con in this area, see Annot., 10 A.L.R.3d 861 (1966).