**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**UNITED STATES RAILWAY EQUIP-MENT COMPANY, Respondent.**

No. 17693.

United States Court of Appeals, Seventh Circuit.

Feb. 3, 1970.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert E. Williams, Frank H. Itkin, Marjorie S. Gofreed, Attys., N. L. R. B., Washington, D. C., for petitioner.

Fredric N. Richman, David H. Mendelsohn, Chicago, Ill., for respondent; Sidney R. Korshak, Chicago, Ill., of counsel.

Before CASTLE, Chief Judge, HASTINGS, Senior Circuit Judge, and KILEY, Circuit Judge.

HASTINGS, Senior Circuit Judge.

This matter is before us on application of the National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 151 et seq., § 160(e), for enforcement of its Order dated June 28, 1968, and reported at 172 NLRB No. 51.

By that Order, the Board directed respondent United States Railway Equipment Company, Washington, Indiana, (Company) to cease and desist from violating Section 8(a) (1) of the Act, 29 U.S.C.A. § 158(a) (1),[1] by effectuating changes in working conditions for the purpose of retaliating against its employees for supporting a labor organization; discriminating against its employees by assigning them more difficult jobs because of their union activities; and promising its employees benefits if they voted against a union. The Board further ordered the Company to cease and desist from violating Section 8(a) (2) of the Act, 29 U.S.C.A. § 158(a) (2),[2] by assisting and contributing support to a labor organization. Affirmatively, the Board ordered the Company to offer to reinstate to his former job an employee allegedly transferred because of his union activity and to post the usual notices.

1. "§ 158. Unfair labor practices
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it."

2. See Footnote 1.

The Company, a wholly owned subsidiary of the Evans Product Company, is engaged in the manufacture and repair of railway cars at plants in Blue Island, Illinois; Plymouth, Michigan; and Washington, Indiana. It maintains collective bargaining agreements with the United Steelworkers of America, AFL–CIO, (Steelworkers) at its Illinois and Michigan plants. Its Washington, Indiana plant, the only one involved here, has been unorganized since the Company commenced operations there early in January, 1966.

On March 2, 1966, the Brotherhood of Railway Carmen of America, AFL–CIO, (Carmen)[3] filed a representation petition with the Board.[4] It was defeated in an election held April 19, 1966. About a year later, on March 23, 1967, the Steelworkers filed a representation petition.[5] The Carmen and Local 144, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, intervened. An election was held May 23, 1967. A majority of the votes were cast for the three unions but none received a clear majority. The Carmen received the highest number of votes, with no union being the next highest choice. A runoff election between the Carmen and "No Union" was held August 8, 1967.

The Carmen were defeated in the runoff. Seventy-three votes were cast for the Carmen and ninety-six against, with seven challenged ballots. The Carmen filed timely objections to the runoff election and also filed the unfair labor practice charge in the instant case. The proceedings were consolidated for hearing.

Several changes in working conditions and one change in an employee's job content shortly after the May, 1967 election form the basis of alleged violations of Section 8(a) (1) by the Company. It is undisputed that prior to that election the Company operated its Indiana plant under liberal rules and practices. It is also undisputed that many of these practices were altered following that election and before the August, 1967 runoff.

Prior to the May, 1967 election, the Company distributed paychecks during the workday whenever they arrived from its Michigan facility. This resulted in a number of employees standing around comparing paychecks and in some employees leaving the plant in the middle of the workday. Employees all took a morning break at the same time and frequently failed to return to work promptly at the end of the allotted ten minutes. Some employees took an additional, unauthorized break in the afternoon. At the end of the day, employees were allowed a ten minute clean up and tool storage period even though a posted "Agreement" (fully discussed below) provided for only a five minute period. Prior to the May election, employee Roy Berry, a leading advocate of the Carmen, welded or placed sole plates most of the time and only occasionally performed the allegedly more arduous job of driving rivets.

After the May election several changes were made by the Company. Paychecks were distributed only at the end of the shift. A system of staggered morning breaks was instituted and the beginning and the end of the ten minute break period was signaled by a system of warning whistles and sirens. It was announced that afternoon breaks were not permitted and that the clean up and tool storage period would be five minutes. Roy Berry was permanently assigned to the task of driving rivets.

The trial examiner found that, with the exception of the change in the clean up period, all of these changes were prompted by legitimate business reasons and not by a desire to retaliate against employees for exhibiting a preference for unionization. The Board found all the changes retaliatory and held each con-

---

3. The Indiana plant had formerly been operated by the B & O Railroad. The B & O had maintained a collective bargaining agreement with the Carmen.

4. Case No. 25–RC–3164.

5. Case No. 25–RC–3470.

stituted a violation of Section 8(a) (1), *supra*.

Our review of factual findings by the Board is limited to determining whether such findings are supported by substantial evidence on the record considered as a whole. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 487–488, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951), Revere Camera Co. v. N. L. R. B., 7 Cir., 304 F.2d 162, 164 (1962). Inferences reasonably drawn by the Board may not be set aside simply because we would have drawn different inferences. N. L. R. B. v. Southern Bell Telephone & Telegraph Co., 319 U.S. 50, 60, 63 S.Ct. 905, 87 L.Ed. 1250 (1943); Revere Camera, *supra* at 164. We do not sit to try labor cases de novo. N. L. R. B. v. Stafford Trucking, Inc., 7 Cir., 371 F.2d 244, 249 (1966).

However, our task on review is made more "difficult when the Labor Board seems to entirely disregard the findings and conclusions of a Trial Examiner." Flack v. N. L. R. B., 7 Cir., 327 F.2d 396, 399 (1963). In such a case, we are instructed by *Universal Camera* to "give to the examiner's report such probative force as it intrinsically commands" as part of the "record considered as a whole." 340 U.S. at 495, 71 S.Ct. at 168.

The Supreme Court further explained the use of the examiner's findings in the same opinion, at 496, 71 S.Ct. at 169: "We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The signifi-

cance of his report, of course, depends largely on the importance of credibility in the particular case." Thus, although the Board gave little weight to the findings and conclusions of the examiner, "we may not brush them lightly aside." United States Steel Co., Joliet Coke Works v. N. L. R. B., 7 Cir., 196 F.2d 459, 463 (1952).

Two central witnesses at the hearing were Plant Manager John A. Meredith, who was largely responsible for the above changes, and employee Bernard Roach who was a member of the Carmen's Union and active in its organizational and election campaign. Roach testified that Meredith told him shortly after the May election that the employees were "going to live hard * * * from now on." He further testified that Meredith made clear his anger over the election results and detailed the various changes in rules, practices and in Berry's job content that he was going to put into effect.

Meredith testified to the same conversation. He admitted that he said that he was disappointed in the outcome of the election but denied making statements about the men "living hard," about changes in plant rules and practices or about Berry. In addition, several of General Counsel's own witnesses contradicted portions of Roach's testimony.

After hearing this and other testimony, the examiner concluded: "To establish a discriminatory motive (other than the timing) for all of the changes except cutting the cleanup period, one would have to rely on Roach's testimony. Respondent's explanations for the change of the pay time, the establishment of new hours for morning breaks, the shift of jobs for Roy Berry, and the fact that there were no afternoon breaks to be eliminated, all appear frank and reasonable from the totality of the evidence. It is only if Roach is to be believed that a finding could be made that the changes were made to punish the employees because of their union proclivities. The sole exception to this seems to be the cutting of the afternoon cleanup time. From Meredith's testimony regarding

his conversation with Roach and why he cut the afternoon cleanup time, it seems he was rather unhappy with the election results and this single change was done as a return blow to the men for not giving him and the Company a vote of confidence."

The examiner further concluded: "I do not believe Bernard Roach testified truthfully regarding his conversation with Meredith. This conclusion is based on several things * * *. [Detailing reasons.] Meredith appeared to me to be a candid witness who sought to give his best recollection. * * * I cannot believe Roach's neat little package of discriminatory purpose for all the changes when they have a rational explanation which comports with objective facts and the testimony of other General Counsel and Respondent witnesses."

We have carefully reviewed the transcript of the proceeding before the examiner. Accepting his judgments as to the credibility of the witnesses, which we find confirmed even by the cold record before us, we have reached the firm conclusion that the decision and order of the Board as it relates to the changes in work practices and Berry's job content is not supported by substantial evidence on the record considered as a whole.

Meredith, whose testimony was expressly credited by the examiner, and other Company management personnel provided plausible business reasons for each of the changes made. Employment at the Indiana plant had been growing steadily from January, 1966 until the May election. As the work force increased, the lax practices of the Company apparently began to produce serious problems which the Company had a right to remedy. The existence of many of these problems was confirmed by a number of the General Counsel's witnesses. According to Berry's own testimony, his job content was changed immediately following an economic layoff of fifty men. Apart from the testimony of employee Roach, which was totally discredited by the examiner, we can find nothing to support a finding that these changes were motivated by a desire to retaliate against the employees for expressing a preference for unionizing the plant.

■ We have reached this conclusion as to all the changes made by the Company, including the shortening of the clean up period which both the examiner and the Board found to be in violation of Section 8(a) (1). Even when the examiner and the Board agree, we are clearly not bound by fact findings which we find unsupported by the record as a whole. United Insurance Co. of America v. N. L. R. B., 7 Cir., 371 F.2d 316, 321 (1966), rev'd on other grounds, 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968); Portable Electric Tools, Inc. v. N. L. R. B., 7 Cir., 309 F.2d 423 (1962). In the instant case, our review of the record convinces us that this change was merely one of a number instituted by the Company in an effort to make its operation more efficient. It was made at the same time and by the same man as all the other changes. We find it completely inconsistent to single out this one change as retaliatory while concluding that all of the others were not improperly motivated.

■■ Accordingly, we shall not order enforcement of paragraphs 1(a), 1(b) and 2(a) of the Board's Order. These relate to the changes in work rules and practices and to the change of employee Berry's job content.

The Board further found that the Company violated Section 8(a) (1) of the Act by promising its employees additional benefits if they voted against the union in the August runoff election. The alleged violation occurred during an election-eve speech by Plant Manager Meredith. According to his own testimony, Meredith made the following statements in the course of that speech: "I have heard that some of you are griping about the insurance. The Company has been checking into this and are trying to work out ways to improve it. When I get any information on it I will let you all know. Many of you can recall when this insur-

ance was inaugurated when it was put into effect so you would at least have some protection."

The examiner found no violation in this statement since it was clear that the Company had been making this same promise to the employees for several months prior to the elections. The testimony was that it had become something of a joke around the plant.

The Board again disagreed with the examiner. It found that the reference to the fact that the Company was now actually looking into better insurance programs "exceeded permissible limits of expression since it constituted a promise of a benefit calculated to influence the outcome of the runoff election * * * [which] tended to suggest that ' * * * the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged.'" Citing N. L. R. B. v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964).

█ We conclude that this finding of the Board is supported by substantial evidence on the record as a whole. The mere fact that the employees had heard similar promises in the past does not change the fact that the promise was renewed and the benefit made to appear more imminent in an effort to impinge upon the employees' freedom of choice for or against the Carmen.

Accordingly, we shall order enforcement of paragraphs 1(c), 1(e), 2(b) and 2(c) as they relate to the Company's promising its employees benefits if they voted against the Carmen.

█ Finally, the Company is charged with violating Section 8(a) (2) and (1) of the Act by supporting and assisting a labor organization. The record shows that early in January, 1966, just as the Company was beginning operations at the Indiana plant, Meredith posted a document labeled "Agreement" on company bulletin boards. It was, in fact, not an "Agreement," having been prepared solely by representatives of the Company. The "Agreement" set forth the

rights of the Company and the terms and conditions of employment.

Article 2 of the "Agreement" provided:

"Section 1. The sole purpose of this agreement is to set forth the rates of pay, hours of work and other conditions of employment so as to promote orderly and peaceful relations with all employees, and to achieve uninterrupted and peaceful operations in the plant.

"Section 2. Accordingly, representatives of the Company and five elected representatives of the employees shall meet monthly, or oftener if necessary, at the request of either and mutual convenience of both for the purpose of appraising the problems that may have arisen and to exchange ideas for the betterment and more efficient operation of this Washington, Indiana Plant.

"Section 3. Any employee who has a grievance of any kind should bring his problem to the attention of his foreman immediately so that proper attention can be given and prompt solution be achieved.

"There shall be no interruption of normal production for any reason whatsoever due to a grievance of any kind as all grievances can be settled as described above."

This "Agreement" remained posted at all times relevant herein.

A few days before the August runoff, the Company mailed a letter to the employees reviewing benefits which it had granted them "without interference from outsiders" and concluding: "No outside organization should be permitted to split us."

About the same time, employee Charles E. Withrow, who had previously campaigned for the Steelworkers, decided that he had "better take some initiative action" or the Carmen would win the runoff election. Withrow testified that he mentioned this to a couple of other people and they all decided to "try to do something." Withrow asked Assistant Plant Manager John W. Wildman if he could use a vacant room during the break

period for "a small meeting of a few of the guys." After checking with Meredith, Wildman gave Withrow permission to use the room.

Withrow then called a meeting to institute an anti-Carmen campaign. It was agreed that members of the group would stencil "Vote No" on Company-owned safety helmets which employees wore. The meeting lasted five or ten minutes beyond the end of the break.

Immediately after the meeting, the work of painting the safety helmets was begun. The work was done on Company time in open view of management personnel. Company materials and paint were used.

Withrow and another anti-Carmen employee did no work for at least a day and a half prior to the runoff election. They spent their time campaigning against the Carmen. Each drew on his "kitty" of piece-work production which employees were allowed to hold in reserve. In this way they could campaign full time and still receive full pay.

Withrow campaigned on the basis that "there would be a committee if the Union failed to get elected, that there would be a committee to represent the men, that I would personally see to it that one was organized. * * * [M]y position was our bargaining position would be ten times better with a Union standing on the outside and wanting in and the Company not wanting them."

Withrow held another meeting of anti-Carmen employees on the day prior to the runoff election. Once again, a Company room was used and the meeting was partially on Company time.

The Meredith speech, referred to above, was given on this same day. In the course of it, Meredith said: "I do not think that any Union can get you more than you can get for yourselves."

Shortly after the runoff election, which the Carmen lost, Withrow posted a notice of a meeting at the Moose Lodge Hall to form a "Grievance Committee." At the meeting, it was decided the organization would be called a "Safety" rather than a "Grievance" Committee. Five employee representatives were elected.

Another meeting was held in September. Minutes of the previous meeting were read and economic proposals to be made to the Company were discussed. Among these were a wage increase, better insurance, an additional paid holiday, additional vacation time and a grievance procedure.

The examiner found that these facts showed neither company support nor domination of the Safety Committee, which he found to be a labor organization within Section 2(5) of the Act, 29 U.S.C.A. § 152(5).[6]

He nevertheless concluded that the runoff election should be set aside because of the influence exerted by the "Vote No" group even though the Company was in no way responsible for that group's influence.

The Board agreed that the Safety Committee was a labor organization within Section 2(5), supra. It further concluded that the "close and continuing connection between the 'Vote No' Committee and the Safety Committee * * constituted [them] a single labor organization." This conclusion is supported by substantial evidence on the record as a whole and we accept it. See N. L. R. B. v. Southern Bell Telephone and Telegraph Co., 319 U.S. 50, 56–57, 63 S.Ct. 905, 87 L.Ed. 1250 (1943).

The Board agreed with the examiner's conclusion that the Company did not dominate the "Vote No"-Safety Committee but held that it did lend unlawful assistance and support to it. Substantial

6. Section 2(5) provides:
   "The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the pur-

pose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

evidence on the record as a whole, as outlined above, supports this conclusion of the Board. On the facts set out, the Board could reasonably find that the Company planted the idea of forming a company assisted bargaining committee in the minds of its employees. The "Agreement," the letter to the employees, and Meredith's speech all tend to that result. The Company's statements implying that such a committee could get more for employees than an "outsider" union and its acquiescence in the campaigning of the "Vote No" group despite its newly imposed strict work rules lend substantial support to the Board's finding of assistance and support.

The law is clear that "employer support of an 'inside' or 'independent' labor organization, even absent company domination, constitutes unlawful interference with employees' freedom of choice within the meaning of Section 8(a) (2) * * *." Irving Air Chute Co. v. N. L. R. B., 2 Cir., 350 F.2d 176, 180 (1965) and cases cited therein. See also N. L. R. B. v. Kiekhaefer Corp., 7 Cir., 292 F.2d 130, 133–134 (1961).

Further, as stated by the Supreme Court: "Known hostility to one union and clear discrimination against it may indeed make seemingly trivial intimations of preference for another union powerful assistance for it. Slight suggestions as to the employer's choice between unions may have telling effect among men who know the consequences of incurring that employer's strong displeasure. * * * The existence of that interference must be determined by careful scrutiny of all the factors, often subtle, which restrain the employees' choice and for which the employer may fairly be said to be responsible. Thus, where the employees would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates." International Ass'n of Machinists v. N. L. R. B., 311 U.S. 72, 78, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50 (1940).[7]

Accordingly, we shall order enforcement of paragraphs 1(d), 1(e), 2(b) and 2(c) of the Board's Order as they relate to assisting, supporting or interfering with the administration of the Safety Committee.

In sum, we deny enforcement to those parts of the Board's Order, as set out above, predicated upon changes in working conditions at the Company's Washington, Indiana plant and upon the change in Berry's job content. We grant enforcement of the Order in all other respects, including its direction of a Second Runoff Election.

Enforced in part. Denied in part.

7. The Company relies upon Chicago Rawhide Mfg. Co. v. N. L. R. B., 7 Cir., 221 F.2d 165 (1955). We find it inapposite. That case turned on the factual question of whether the activities of the employer constituted "support" or mere "cooperation." There we concluded the facts showed no more than permissible cooperation. Here we find assistance and support.