NATIONAL LABOR RELATIONS BOARD v. LANDIS TOOL CO. (INDEPENDENT ASSOCIATED WORKERS OF FRANKLIN COUNTY, PA., Intervener).

No. 8614.

Circuit Court of Appeals, Third Circuit.

Argued May 16, 1944.

Decided Oct. 6, 1944.

Geoffrey J. Cunniff, of Philadelphia, Pa. (Alvin J. Rockwell, Gen. Counsel, Malcolm F. Halliday, Associate Gen. Counsel, and Roman Beck and Armin Uhler, Attys., Na-tional Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Lacy I. Rice, of Martinsburg, W. Va. (Herbert E. Hannis and Rice & Hannis, all of Martinsburg, W. Va., on the brief), for Landis Tool Co., respondent.

E. L. Luttrell, of Martinsburg, W. Va., for intervenor-respondent.

Before DOBIE, and McLAUGHLIN, Circuit Judges, and KALODNER, District Judge.

KALODNER, District Judge.

This case comes before the Court on petition of the National Labor Relations Board to enforce its order of July 27, 1943, issued against the Landis Tool Company, respondent herein, pursuant to Sec. 10(c) of the National Labor Relations Act, 49 Stat. 454 (1935), 29 U.S.C.A. § 160(c). This Court has jurisdiction by virtue of Sec. 10(e) of that Act, 29 U.S.C.A. § 160 (e), since the respondent is a Pennsylvania corporation engaged in interstate commerce with plants at Waynesboro and Greencastle, Pennsylvania, within this judicial circuit, where the alleged unfair labor practices in question occurred.

The questions involved here are whether the Board's findings of fact with respect to the unfair labor practices are supported by substantial evidence; whether on the facts found by the Board respondent has violated Section 8(1) and (2) of the Act, 29 U.S.C.A. § 158(1, 2); and whether the Board's order is valid.

The order[1] of the Board was issued upon charges filed by the International Asso-

---

[1] "Upon the entire record in the case, and pursuant to Section 10(c) of the National Labor Relations Act, the National Labor Relations Board hereby orders that the respondent, Landis Tool Company, Waynesboro, Pennsylvania, and its officers, agents, successors, and assigns shall:

"1. Cease and desist from:

"(a) Dominating or interfering with the administration of, or contributing support to, the Shop Council of Landis Tool Company, and dominating or interfering with the formation or administration of, or contributing support to, the Employees' Association of Landis Tool Company, Independent Associate( Workers, Inc., or any other labor organization of its employees;

"(b) Recognizing the Shop Council of Landis Tool Company, the Employees' Association of Landis Tool Company, or Independent Associated Workers, Inc., as the representative of any of its employees for the purpose of dealing with the respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of employment;

"(c) In any other manner interfering with, restraining, or coercing its employees in the exercise of the rights to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activity, for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the Act.

"2. Take the following affirmative action, which the Board finds will effectuate the policies of the Act:

"(a) Withdraw all recognition from and completely disestablish Independent As-

ciation of Machinists, Lodge 513,[2] (hereinafter referred to as the Union), following hearing and argument in which the Board, the Union, the respondent, and the Independent Associated Workers, Inc., (hereinafter called the I. A. W.), participated.

The record discloses that in 1919, as a result of severe labor trouble in and around Waynesboro, a plan of employee representation was put into effect in respondent's Waynesboro and Greencastle plants: A plan which respondent's production manager at that time, a Mr. Gray, was active in developing. Under this plan, all the non-supervisory employees of respondent, with at least sixty days service, were eligible to participate in the selection, by ballot, of fellow employees who were to serve as their representatives on a "Shop Council." Elections were held periodically, on company time and property, with ballots furnished by respondent. Meetings of the Shop Council were held monthly, and Mr. Gray, when present, acted as recording secretary, although he was not a member of the Council. The Council had no revenue from the employees. This plan was continued until sometime in 1937, two years after the Wagner Act was passed. However, shortly after the Wagner Act was upheld (N. L. R. B. v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352), Mr. Gray, then respondent's general manager, orally informed the Shop Council that respondent would no longer deal with it. Mr. Gray testified that it was left to the Council to inform the employees, but he also stated that it was the usual procedure to post "notices of this kind," and that he believed such a notice was posted. Mr. Hollengreen, assistant general manager at that time, testified that he was under the impression that a notice was posted. Nevertheless, meetings of the Shop Council continued to be held, and the minutes of these meetings are of interest. For example, the minutes of the meeting of May 10, 1937, disclose that a secretary was elected, and that six employees were appointed to serve on a committee with the Council "to revise the Constitution and By-Laws" of the Shop Council. At the meeting of May 19th, there was a general discussion relative to the "reorganization of the existing Council," tentative plans for a constitution were adopted "subject to any change the Council might deem advisable," and the name "Employees' Association of the Landis Tool Co." was chosen. The only substantial difference between the Shop Council plan and the Employees' Association was that the latter collected 25 cents a month from each employee as dues, and had a secretary. The fundamental plan of organization and representation remained the same.

It appears that the Representation Committee of the Employees' Association first sought a meeting with respondent sometime in the summer of 1937, but the record fails to disclose any written or oral contract, or any letter of recognition, or any attempt on the part of respondent to determine whether the organization had a majority membership of its employees.

The evidence with respect to some of the dealings of the respondent with the Employees' Association is of importance. In October, 1937, Gray and Hollengreen announced at a meeting with the Committee that a bonus would be paid, and on October 22, 1937, a notice to this effect was posted, explaining that it would be paid as a result of negotiations with the Committee. On June 6, 1938, respondent gratuitously granted the use of the plant recreation room to the Association for its regular monthly and quarterly assemblies. On April 6, 1940, Gray and Hollengreen called a meeting of the Committee of the Association to "discuss" an increase in wages, and later Hollengreen called a meeting at which he announced a system of work hours operating as an increase in pay. The minutes of the meeting of April 11, 1941, record an announcement by Hollengreen that respondent intended to grant an increase in wages: on the same day a notice was posted announcing the increase, crediting the Association with obtaining it.

In August, 1941, following the appearance of an organizer for the Union, certain members of the Association, who were also on the Committee, began activities which resulted in the formation of the I.

sociated Workers, Inc., as the representative of any of its employees for the purpose of dealing with the respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of employment; * * *"

[2] The Union has notified the Board of its withdrawal of affiliation with the American Federation of Labor.

A. W. The only substantial difference between the I. A. W. and the Association was that the former was chartered under the Non-Profit Corporation Law of Pennsylvania, 15 P.S.Pa. § 2851—1 et seq., and its Representation Committee consisted of 34 members. Nevertheless, the Association continued in existence, and the uncontradicted testimony was that the Committee of the I. A. W. considered it advisable to continue the existence of the Association in order to petition respondent for the annual bonus in the event that the I. A. W. failed to obtain a majority membership by the proper time. It does not appear clearly whether the members of the Association Representation Committee ever resigned in view of their close connection with the I. A. W. as officers and members, and there is no evidence that any resignation was accepted by the Association. However, these members continued to function on the Association Representation Committee when, in October, 1941, the assets of the Association were disposed of.

On October 7, 1941, the I. A. W. held an election of representatives in the various departments of the plant. Although the I. A. W. had not yet been recognized, and its membership campaign was in full swing, it appears that its temporary officers handled grievances before October 7th, and certainly its Committee handled grievances after that date.

Both the I. A. W. and the Union engaged in intensive membership campaigns after about August, 1941. The record shows some soliciting was done by both organizations on company time and property, but there is considerable conflicting evidence as to whether the I. A. W. pursued its activities with the knowledge and aid of the respondent. One Victor Martin and one Lud Friel were on the grievance committee of the I. A. W. for the day shift and the night shift respectively, and they were permitted to leave their work to handle grievances when reported to them. However, both testified they frequently left their work to solicit membership for the I. A. W. and that such solicitation was done openly and with the knowledge of the various plant officials. For the most part, respondent's officials did not deny various conversations, and did not deny that they gave permission to Friel, Martin, and others to leave their work, but they asserted permission was given on the assumption that these men were handling grievances. Friel further testified that a foreman, Brindle, told him he favored the I. A. W. and would send him some employees to enroll, and that at least one employee was sent to him. One Toms testified that his foreman told him if he were Toms he would join the I. A. W.; and one Lester Saunders testified that Assistant Foreman Davis told him he was in a position to know that no bonus would be paid unless a majority joined the I. A. W.

The respondent introduced in evidence a letter to its officers and foremen directing them to remain neutral; the letter was signed by all the officers and foremen in accordance with instructions, as proof that each had received a copy. It does not appear that respondent ever attempted to ascertain whether the orders in its letter were being carried out. Respondent also showed that some 900 men were transferred in the plant that year, and denied the specific reasons for moving Martin to a machine where he could be watched after he disassociated himself from the I. A. W. Many witnesses were brought forward who stated that they felt free to join either union.

The record reveals that on November 21, 1941, respondent formally recognized the I. A. W., although there is no evidence that the Association was ever disestablished or denied recognition by the respondent. There was testimony that after the bonus was paid in December, 1941, many of the men who had signed with the I. A. W. were dissatisfied and dropped out of the organization. In May, 1942, Union sought recognition from respondent, but was referred to its attorneys, who said that the Union would have to be certified by the Board. Negotiations between the I. A. W. and respondent, begun after the former was recognized, were dropped in May, 1942, and no contract was executed. Nevertheless, on June 1, 1942, respondent posted a notice granting a wage increase of 5%, attributing it to the efforts of the I. A. W., noting that the original request was made before any other organization claimed recognition, and stating that it might be necessary to hold an election for certification of the majority organization by the Board. On August 2, 1942, another increase was granted, and the notice recited the contents of the June 1st notice.

The Board found that the respondent "dominated and interfered with the admin-

istration of and contributed support to the Shop Council, and further that the respondent dominated and interfered with the formation and administration of and contributed support to the Association and the I. A. W." Upon the entire record it found that the I. A. W. was successor to the Association and the Council, and that respondent was responsible for "the existence of conditions and circumstances which deprived the employees of that complete and unhampered freedom of choice which the Act contemplates."

Respondent maintains that the Shop Council was a valid labor organization, that, in any case, it was properly disestablished, that there is no substantial evidence on which to base a finding that the Employees' Association and the I. A. W. were successors of the Shop Council and that there is no substantial evidence to support the findings of domination, interference and support of these unions.

We are of the opinion that the evidence, as set out above, is substantial and that it supports the findings and conclusions of the Labor Board. By far the greater part of the evidence was not controversial. The only part of the substantial evidence subject to conflicting testimony was that relating to the conversations between Martin, Friel, and certain of the foremen, but it must be pointed out that the testimony of the witnesses the Board chose to credit was corroborated by other witnesses or supported by the circumstances or facts as admitted by the respondent's own witnesses.

■■ In addition to asserting that certain witnesses should or should not have been believed, respondent seeks to minimize the effect of the facts and urges upon us inferences other than those drawn by the Board from the established facts. However, in cases of this kind, the rule, so well established as to be axiomatic, is that credibility of witnesses, the weight to be given their testimony, and the inferences to be drawn from the facts, are all matters for the Board. N. L. R. B. v. Newport News Co., 1939, 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219; N. L. R. B. v. Southern Bell Co., 1943, 319 U.S. 50, 63 S.Ct. 905, 87 L. Ed. 1250; N. L. R. B. v. M. E. Blatt Co., 3 Cir., 1944, 143 F.2d 268. Moreover, the fact that a contrary inference is possible does not warrant setting aside the inference drawn by the Board. Virginia Electric Co. v. N. L. R. B., 319 U. S. 533, 542, 63 S.Ct. 1214, 87 L.Ed. 1568, rehearing denied, 1943, 320 U.S. 809, 64 S.Ct. 27.

■ The contention of the respondent that the Shop Council was a valid labor organization is without merit. The plan of the Shop Council is not unlike that held illegal by this Court in N. L. R. B. v. McLain Fire Brick Co., 3 Cir., 1942, 128 F.2d 393: and the facts and circumstances in the record of this case support the Board's conclusion.

■ The issues raised by respondent as to the propriety of the Board's conclusion that the Shop Council was not properly disestablished and that the Employees' Association and the I. A. W. were successor organizations are subject to the same rules. The short answer is that the Board has resolved this contention against the respondent, and we cannot say it exceeded its authority in so doing. More specifically, these issues are governed by two cases: Westinghouse Electric & Mfg. Co. v. N. L. R. B., 2 Cir., 1940, 112 F.2d 657, affirmed, 1941, 312 U. S. 660, 61 S.Ct. 736, 85 L.Ed. 1108; and N. L. R. B. v. Baldwin Locomotive Works, 3 Cir., 1942, 128 F.2d 39. The facts surrounding the demise of the prior union and the advent of the new union in those cases are so similar to the facts in the instant case that it is unnecessary to discuss the matter further. With respect to the matter of the finding of successorship, the Court in the Westinghouse case, 112 F.2d at page 660, in discussing the case of N. L. R. B. v. Newport News Co., supra, said: "There also there had been a 'Plan' in which company representatives had participated, and which became unlawful after the passage of the Act; there also this 'Plan' had been succeeded by an unaffiliated union; though, unlike the case at bar, the company retained some measure of control over amendments to its constitution. The court thought this factor enough to condemn the union, but it did not rest its decision upon that alone; for it held that the successor ought to be 'disestablished', even if this feature were removed. The reason for this was that, although the new union would be lawful, if freely formed, it had in fact arisen out of the earlier organization, and the company had done nothing to mark the separation between the two, and publicly to deprive the successor of the advantage of its apparently continued favor." The test of successorship is whether there existed, insofar as the employees are concerned, an appearance of continuity and relation be-

tween the preceding illegal organization and the later organization so that the employees were not apprised of the fact that the new organization did not carry with it the preference, domination, and interference which accompanied the prior organization. The Board concluded, on the facts, that this test was not satisfied, and its conclusion of continuation of the effects of an employer-dominated beginning is a permissible one for the Board to draw. Virginia Electric Co. v. N. L. R. B., supra, 319 U.S. at page 542, 63 S.Ct. 1214, 87 L.Ed. 1568. We are of the opinion that, having established the illegality of the Shop Council, the Board, on the record in this case, could find the Association and the I. A. W. to be illegal organizations as its successors, even if there was absent, and there was not here, additional evidence warranting a finding of other unfair labor practices with respect to those two unions.

 The intervenor, the I. A. W., makes a persuasive argument that it ought not to suffer, through disestablishment, because of the unwanted favor of the respondent and the collusive acts of several of its members. Whether this Court is disposed to agree with the intervenor is immaterial, for having established the unfair labor practices, the successorship, and the illegality of the I. A. W., it is for the Board in its discretion, not the Court, to determine how the policy of the Act may best be effectuated.

The Supreme Court in International Ass'n of Machinists v. N. L. R. B., 1940, 311 U. S. 72, at page 82, 61 S.Ct. 83, at page 89, 85 L.Ed. 50, set the rule by which we are bound: "Where as a result of unfair labor practices a union cannot be said to represent an uncoerced majority, the Board has the power to take appropriate steps to the end that the effect of those practices will be dissipated. That necessarily involves an exercise of discretion on the part of the Board—discretion involving an expert judgment as to the ways and means of protecting the freedom of choice guaranteed to the employees by the Act. *It is for the Board, not the courts, to determine how the effect of unfair labor practices may be expunged.*" (Emphasis supplied.) To the same effect are N. L. R. B. v. Pennsylvania Greyhound Lines, 1938, 303 U. S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; N. L. R. B. v. Link-Belt Co., 1941, 311 U. S. 584, 600, 61 S.Ct. 358, 85 L.Ed. 368; Virginia Elec-

tric Co. v. N. L. R. B., supra. The Board has concluded that the existence of the I. A. W. was an obstacle to the employees' exercise of their statutory rights, and we cannot substitute our discretion for the Board's to say that disestablishment is not the proper remedy.

Finally, respondent suggests that it was improper for the Board to include in its order not merely the respondent, its officers and agents, but also its "successors and assigns." This is the customary wording of Board orders, and the cases affirming such orders are too many to cite. Such an order was approved by this Court in N. L. R. B. v. Weirton Steel Co., 3 Cir., 1943, 135 F.2d 494, 499, and the Supreme Court has also indicated approval: see Southport Petroleum Co. v. N. L. R. B., 315 U. S. 100, 106, 62 S.Ct. 452, 86 L.Ed. 718, (and footnote 6), rehearing denied 1942, 315 U. S. 827, 62 S.Ct. 637, 86 L.Ed. 1223.

A decree will be entered enforcing the order of the Board.