CONTRACT BATTERY MANUFAC-
TURING COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 15639.

United States Court of Appeals
Fifth Circuit.

Feb. 2, 1956.

———◆———

Michel G. Emmanuel, Tampa, Fla. (Mabry, Reaves, Carlton, Fields & Ward, Tampa, Fla., of counsel), for petitioner.

John S. Patton, N.L.R.B., Atlanta, Ga., Marcel Mallet-Prevost, Asst. Gen. Counsel, David P. Findling, Assoc. Gen. Counsel, Washington, D. C., Theophil C. Kammholz, Gen. Counsel, Frederick U. Reel, Alice Andrews, Washington, D. C., for N.L.R.B.

Before HUTCHESON, Chief Judge, and RIVES and CAMERON, Circuit Judges.

HUTCHESON, Chief Judge.

The board having affirmed the examiner's ruling, adopted his findings, conclusions, and recommendations, and entered its decision and order [1] accordingly, petitioner, seeking to vacate and set it aside, is here insisting that the order is without support in the record considered as a whole, while the board joins issue with petitioner and seeks enforcement of its order.

Urging upon us generally that examiner and board "reached their conclusions by the simple expedient of declaring all of the petitioner's witnesses to be liars, while clothing the union's witnesses with a virtue which no doubt would surprise their friends and associates", the petitioner insists that "The numerous instances in which the trial examiner made questionable findings and drew doubtful conclusions concerning the credibility of the witnesses and misinterpreted or misunderstood the testimony, should lead the court to especially scrutinize those decisions and findings on review".

Specifically as to Dry's discharge, upon which its attack is most vigorous, petitioner urges upon us that it was for cause and, therefore, protected, and that a proper consideration and analysis of the evidence will show that the conclusion of examiner and board, that it was because of his membership in, or activities on behalf of the union, is without support in the record.

As to the findings that petitioner engaged in unlawful surveillance and interrogation, interference with, and threats against, its employees, petitioner takes the firm position that the evidence as to the incidents relied on taken as a whole will not support the findings that they occurred, and, if it does, will not support

1. Commanding petitioner: to cease and desist from engaging in surveillance and interrogation of, and threats against, its employees and from illegally discouraging or otherwise interfering with their right to join or form labor organizations; and to offer reinstatement to and make whole Price Dry, an illegally discharged employee. 112 N.L.R.B. 109.

the conclusion that they amounted to prohibited activity.

The board, on its part, points to evidence, particularly that of Bernard Wallace, which it insists is credible and if believed fully supports the findings and conclusions of the examiner as to surveillance, interrogation, interference and threats, and that Dry's union affiliation was known to his employer, and that it was this and not any other dissatisfaction with him or his work which was the moving cause of his discharge.

It will be of no advantage to set the evidence out. It will suffice to say that a careful examination of the record and the pertinent portions of the appendices of petitioner and respondent leads to the inescapable conclusion that the petitioner's question, "Are the findings of the board with respect to questions of fact supported by substantial evidence on the record considered as a whole?", should be answered in the affirmative, indeed can not be properly answered any other way. This is not to say that petitioner did not present evidence to the contrary of that offered by the general counsel or that if the examiner had discredited Wallace and some of the other witnesses he could not, and ought not, to have found differently. It is to say, though: that the record does not support petitioner's conclusion; and that its petition to set the order aside should be denied and the board's petition to enforce it should be granted and enforced.

CAMERON, Circuit Judge (dissenting).

I am unable to join my brethren in adopting the findings of the Board based upon the examiner's report because I find no believable evidence upon which they can be rested. In the argument before us both sides agreed that the General Counsel had no case unless the testimony of the witness Wallace was believable. I think his testimony is inherently incredible and must be rejected and that, with it, the whole case falls.

The General Counsel's case is built around the discharge, on June 1, 1954, of Price Dry, an employee who had worked for petitioner about four years. It was undisputed that Dry was not active in the union organization, and the employer is assumed to have discharged him solely on what it learned from Wallace; and Wallace did not testify that he made any report at all with respect to Dry and there was no evidence that the petitioner had any information that Dry had engaged in union activity or even that he had applied for membership.[1]

Wallace testified that he was engaged by the management to act as a spy and to keep Dry and two or three other employees under surveillance. Wallace had been with the Company at that time less than a month[2] and his only prior contact with petitioner had been when he worked about a month in 1953 before being laid off. Nevertheless, according to his statement, he was selected over about fifty employees, some of many years' service, to perform this delicate and highly confidential work. In addition to the fact that he was little known to the management, it was undisputed that he

1. This Court has recently held that it was a settled principle that "some legally justifiable inference of employer knowledge of a dischargee's union membership is an essential prerequisite to a valid finding of discriminatory discharge therefor." N.L.R.B. v. National Paper Co., 5 Cir., 1954, 216 F.2d 859, 862. And see also N.L.R.B. v. Ray Smith Transport Co., 5 Cir., 1951, 193 F.2d 142, 145, and Tampa Times Co. v. N.L.R.B., 5 Cir., 1952, 193 F.2d 582, 583.

2. It was, in fact, two weeks or less. Wallace, when asked when he went with the Company, stated, in response to a question by one of the officials: "Well, I don't know. I was only there about a week, maybe a week and a half, and * * * Mr. Gray came back by, asking the boys if they had got a union letter and card for the union and they said yes; and he asked me and I told him no, that I was just called back to work, that I hadn't got any." It was undisputed that this letter was sent out by the union organizer May 21st.

stated to them unequivocally that he had been a union officer and member constantly over a number of years. All of his work had been in West Virginia, and he was evidently a newcomer to Florida. Here is his statement of the circumstances attending the assignment of this important task to him:

"Q. Now did Mr. Carswell on any occasion ask you to go with him to Mr. Cherington's office? A. Well, a few days after this conversation with Mr. Gray [covered in Note 2, supra], Mr. Carswell came to me and told me he wanted me to come in on the three to eleven shift with Mr. Howard on the grid machine, and when I came in on the three to eleven shift he asked me had I saw Mr. Cherington yet. I told him no. He said, 'He wants to see you up in the office.' And I went up to his office, and he told me he wanted a history of my past employment for ten years, and he said he realized it would be hard but do the best I could, and I told him where I had worked and what I had done and the places I had been. *And he asked me was any of those places union shops, and I told him yes, they all was. And then he told me that he wanted me to go back in the back end, and see what I could find out about the union men,* who was the ringleaders back there of the union; and I went back—" [Emphasis added.] Later he explained that he had been an officer in several unions in West Virginia, both C.I.O. and A.F. of L.

The quoted story is simply unbelievable. It does violence to what everybody knows about human nature and runs counter to common knowledge and experience. No sensible man would have employed a stranger in such a capacity and upon such a showing as is set forth in the quoted statement.

Moreover, it is unbelievable that the Company would have selected Dry as an object of surveillance and would have

fired him. He had been employed while in his fifties to work as a janitor, and had been raised to the work he was doing when discharged,—a higher type of work but still menial in nature. The whole record shows that he was a man without force or influence, and certainly was not the type of man management would suspect of having leadership qualities. He was the only man discharged, and that took place within ten days of the date the letter was sent out. Both Wallace and Dry were contradicted by all of the officers of the Company who testified.

But we lay this conflict aside and base this opinion upon the statement that Wallace's evidence is inherently unbelievable. In a situation not unlike this one[3] we characterized such a statement as "monstrous". And we have recently held that, "Courts are not required to believe testimony which is inherently incredible or which is contrary to the laws of nature and of human experience, or which they judicially know to be unbelievable." Geigy Chemical Corp. v. Allen, 5 Cir., 1955, 224 F.2d 110, 114. We further said, at page 114, note 5: "'If there be any one thing in the administration of law upon which the decisions, the texts, and the general opinion of bench and bar are in agreement, it is that evidence which is inherently unbelievable or incredible is in effect no evidence * * *. "An inherently incredible story is not made credible by being sworn to. * * * Courts are not required to believe that which is contrary to human experience and the laws of nature, or which they judicially know to be incredible * * * although there may be evidence tending to support it."'" We have said much the same thing in Labor Board cases.[4] In the Robbins case, supra, we adverted to the fact that, "This Court has many times pointed out the anomalous position of the Board,

---

3. Firemen's Mut. Ins. Co. v. Aponaug Mfg. Co., 5 Cir., 1945, 149 F.2d 359, 363.

4. National Labor Relations Board v. Robbins Tire & Rubber. Co., 5 Cir., 1947, 161 F.2d 798, 800, and N.L.R.B. v. Phelps, 5 Cir., 1943, 136 F.2d 562, and the cases mentioned in note 1, supra.

first, as accuser appearing before itself as judge, second, as judge judging its own accusations, and, third, as prosecutor before us insisting that its determinations as judge must be enforced * * * ". Note 2, at page 799.

Nor am I tempted to succumb to a spirit of frustration based upon the idea that we cannot perform our full constitutional duty as a court when called upon to ascribe to Labor Board findings the respect to which they are justly due. Such an attitude does not comport with what the Supreme Court has said in one of its late cases reconciling the concept that Labor Board decisions should stand if supported by ˋsubstantial evidence with the provisions of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, at pages 489–490, 71 S.Ct. 456, 465, 95 L.Ed. 456, from which we quote:

"Some scope for judicial discretion in applying the formula [for judicial review of administrative action] can be avoided only by falsifying the actual process of judging or by using the formula as an instrument of futile casuistry. It cannot be too often repeated that judges are not automata. The ultimate reliance for the fair operation of any standard is a judiciary of high competence and character and the constant play of an informed professional critique upon its work.

" * * * We should fail in our duty to effectuate the will of Congress if we denied recognition to expressed Congressional disapproval of the finality accorded to Labor Board findings by some decisions of this and lower courts, or even of the atmosphere which may have favored those decisions.

"We conclude, therefore, that the Administrative Procedure Act [5 U. S.C.A. § 1001 et seq.] and the Taft-Hartley Act [29 U.S.C.A. § 141 et seq.] direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. * * * The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both."

That expressed attitude of the Supreme Court gives impressive stature to the concurring opinion of Judge Waller in N.L.R.B. v. Robbins Tire & Rubber Co., supra, in which he decried the tendency of courts to abdicate in favor of administrative functionaries,—a reading of which opinion tends definitely to buoy up the spirits of those tempted to look with despair upon their encroachment upon the judicial prerogative. He quoted from Crowell v. Benson, 1931, 285 U.S. 22, 60, 52 S.Ct. 285, 76 L.Ed. 598: " 'In cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of that supreme function' "; and he concluded with a sentence with which this dissent is closed:

"A finding by an examiner, whether arrived at carefully and skillfully, or through incredible credulity, or simple stultification, should be deemed prima facie correct but should never be substituted in place of the power which the people in their Constitution solemnly and surely committed to their courts."