Edward SWOPE et al., Appellants,

v.

The EMERSON ELECTRIC MANUFACTURING COMPANY, et al., Respondents.

No. 45388.

Supreme Court of Missouri,

Division No. 2.

May 13, 1957.

Motion for Rehearing or to Transfer to Court en Banc Denied June 10, 1957.

William P. Byrne, St. Louis, for appellants.

R. H. McRoberts, R. H. McRoberts, Jr., St. Louis, for defendants-respondents, Bryan, Cave, McPheeters & McRoberts, St. Louis, of counsel.

EAGER, Presiding Judge.

In this suit fifteen former maintenance employees of Emerson Electric Manufacturing Company sought the recovery of three hundred thousand dollars as damages upon the theory that the employer and the individual defendants conspired to discharge plaintiffs because of union activities, and in breach of their employment contract. During their employment plaintiffs were all members of Local 1102, International Union of Electrical, Radio & Machine Workers, C. I. O. The suit was instituted on February 3, 1954; the union is not a party to this suit. Ten of the officers and supervisory personnel of the corporation were joined as defendants, descending in grade from the President to the General Foreman of the Maintenance Department. We note at this point the following allegations of plaintiffs' petition, as amended: " * * * that said defendants conspired and plotted to discharge these plaintiffs for the reason that these plaintiffs were the most active in union affairs and had been threatened with dismissal on numerous occasions by said defendants. * * * That said discharge was not a true discharge but rather was a subterfuge on the part of said defendants to discharge plaintiffs for their union activities." The details of the discharge will be developed more fully in our statement of the facts. The damages sought were for loss of wages, past and future, and for loss of seniority rights "and other privileges."

Defendants, by motion to dismiss and by answer, asserted that the court had no jurisdiction over the subject matter of the suit because the National Labor Relations Board had exclusive jurisdiction thereof as an unfair labor practice; they also alleged that plaintiffs had, on or about September 8, 1953, filed with the Regional Director of the Labor Board their claims for reinstatement, that the Board found no evidence of unfair labor practices, and that it declined to issue a complaint. The answer further alleged the conclusive effect of an arbitration held under the collective bargaining agreement existing between the employer and the union. In their reply, plaintiffs alleged that the arbitration award was void for various reasons (some of which we need not mention), including the assertion that the union and the employer used the arbitration as a "sham and artifice" to remove them from employment because they had been critical of "union policy"; and they further alleged "that the action of the regional director, Fourteenth region, National Labor Relations Board, was the result of bias and prejudice against these plaintiffs," in that he failed and refused to hear evidence from them in support of their charges and only took the statement of one of them, (reciting certain facts which were supposedly thus ignored), and that plaintiffs were thereby deprived of valuable property rights, "without due process"; they denied that the "findings of the regional director are conclusive."

At the trial, which began on October 24, 1955, the court directed a verdict in favor of all the individual defendants, and also directed a verdict for all defendants against the plaintiff Branson, since he had failed to appear. The jury found and returned separate verdicts (as to each plaintiff) in favor of the remaining defendant, Emerson Electric Mfg. Company. Motion for new trial was duly filed and overruled. Since this appeal was taken, the plaintiff Willie Swope has voluntarily dismissed his appeal.

We shall state here certain of the facts, as briefly as possible. In so far as the issues were submitted to the jury we may consider the evidence in the light most favorable to the verdict below. Wright v. Osborn, 356 Mo. 382, 201 S.W.2d 935. This, however, will not be determinative of the case, in view of the basis of our decision. A collective bargaining agreement was in force between Emerson Electric Mfg. Company (hereinafter called "the Company") and Local 1102 of the union. That agreement expressly provided that: "* * * there shall be no strikes, slow-ups, sit-downs, sympathy strikes, stoppage of work or any other form of interference with production or other operation. Any individual or group violating the above may be discharged." The maintenance force of the company consisted of approximately 125 men, including millwrights, carpenters, pipefitters, and members of other crafts. For several years there had been recurrent discussions between the company and representatives of the maintenance crew about bringing in outside labor to erect new furnaces; letters had passed on the subject, but neither the existing agreement nor the past procedure is entirely clear from the record. It is indicated in the letters that the company had reserved the right to bring in such labor when deemed necessary or expedient, but that the union would be notified in advance. During the spring of 1953 the company had contracted for the erection of a new annealing furnace by the Surface Combustion Company; apparently that work was to begin on Friday, August 21, 1953. Very shortly before that date the union was notified, and much dissatisfaction ensued. On Friday the maintenance force stopped work and gathered in the department; the general foreman told them to go to the cafeteria, and there considerable discussion took place. Much stress is laid by plaintiffs on their claim that Mr. Hughes, Assistant Works Manager, there and then told the men that if they would all go back to work he (or other officials) would meet with them the first thing Monday and

thresh the matter out. There are several different versions of the statement, but these differences are immaterial in the view we now take. The various shifts did work on Friday night, Saturday, and Sunday and for an hour on Monday morning. The day shift then quit work and assembled again, en masse, in the cafeteria; after an hour or so they were specifically told to go back to work, that there had been a "misunderstanding" about the meeting, and that they would be paid for the time then lost. Nevertheless, the group, generally, "sat out" the day Monday and substantially all of Tuesday morning, remaining in the cafeteria. It is significant here to note that during this time and previously the officials of the union were holding frequent talks with the company concerning the supposed grievance, that they made efforts to get the men back to work, and that it was not "normal procedure" for the employer to meet with the individual men on grievances. It is not denied that the local and its officers had general authority to represent the men in such negotiations. The gist of the situation is that there was a "wildcat" stoppage of work, not authorized by the local or its officers, and continuing against the will of the latter, except in so far as these plaintiffs claim that the stoppage was justified by the breach of the company's agreement to meet with them on Monday morning. In the view we take of the case, we need not decide the possible effect of any such agreement. Shortly after 11:00 A.M. on Tuesday, August 25, 1953, suspension notices (which, under the contract, were preliminary to a discharge) were passed out to all the men present in the cafeteria, and similar notices were given later to those maintenance employees who were not then present. At that time the group had given no notice of any intent to return to work. Within the next few days approximately 110 of the men were re-employed, apparently as new employees. The plaintiffs were not re-employed. One testified that he was told: "We don't have a job for you. I believe

you were the instigator of trying to get the AFL Union in here * * *." The discharges were expressly stated to be based upon "an unauthorized work stoppage and an illegal sit-down strike."

The contract provided for hearings following discharge, if requested. Such hearings were begun, but after a few men were interviewed the union officials present decided to short-cut the procedure and proceed to an immediate arbitration. Plaintiffs say that this was done because the hearings proved to be a mere "kangaroo" proceeding, or sham; be that as it may, the grievance procedure was expedited and an arbitrator agreed upon. The arbitration was held on September 10, 1953, and the arbitrator found that the discharges were for proper cause; he denied the grievance. Plaintiffs attack the arbitration award vehemently, because the arbitrator was not sworn, because he did not hear sworn testimony, because the union failed to represent them properly, and for other reasons. This also has become immaterial in the view we take of the case, as have also certain other allegations of error in counsel's brief.

We have decided that the trial court had no jurisdiction of the subject matter of this action. The allegations and admissions in the pleadings raise a necessary inference that the employment of plaintiffs was one within the scope of the Labor Management Relations Act, Title 29 U.S.C.A. § 151 et seq.; in other words, plaintiffs and the employer were engaged in interstate commerce and thus subject to the act. It is conceded in the reply that plaintiffs sought to invoke the jurisdiction of the Labor Board by filing with the Regional Director a petition seeking reinstatement. As a part of plaintiffs' case it was shown that the company had plants in both Missouri and Illinois. The evidence of defendants specifically shows substantial interstate commerce, and, since this only goes to a matter of law (i. e., jurisdiction), we could consider that evidence, if necessary. We

believe, however, that the pleadings and plaintiffs' evidence sufficiently establish the fact.

 It has consistently been held that a discharge because of union activities is an unfair labor practice as a "discrimination in regard to hire or tenure of employment," Title 29 U.S.C.A. under § 158(a) (3). N. L. R. B. v. L. Ronney & Sons Furn. Mfg. Co., 9 Cir., 206 F.2d 730; N. L. R. B. v. Cornell-Dubilier Elec. Corp., 4 Cir., 224 F.2d 627; N. L. R. B. v. Nabors, 5 Cir., 196 F.2d 272; Local No. 3, United Packinghouse Workers of America, C.I.O. v. N. L. R. B., 8 Cir., 210 F.2d 325; N. L. R. B. v. McGahey, 5 Cir., 233 F.2d 406; Contract Battery Mfg. Co. v. N. L. R. B., 5 Cir., 229 F.2d 354; N. L. R. B. v. Lewisburg Chair & Furn. Co., 3 Cir., 230 F.2d 155. And, with a few specified exceptions, the clear import of the federal cases now is that the state courts may not exercise jurisdiction as to those matters constituting unfair labor practices under the federal act. Weber v. Anheuser-Busch, Inc., 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546; Garner v. Teamsters, etc., Union, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228. In the Weber case the Supreme Court said, 348 U.S. loc. cit. 481, 75 S.Ct. at page 488: "* * * But where the moving party itself alleges unfair labor practices, where the facts reasonably bring the controversy within the sections prohibiting these practices, and where the conduct, if not prohibited by the federal Act, may be reasonably deemed to come within the protection afforded by that Act, the state court must decline jurisdiction in deference to the tribunal which Congress has selected for determining such issues in the first instance." For a rather full discussion of the subject, see also the opinion of this court in Graybar Electric Co. v. Automotive, P. & A. I. Emp. Union, Mo., 287 S.W.2d 794. There the majority of the court also held that although the Regional Director of the Labor Board had declined to issue a complaint of an unfair labor practice (such action being sustained on appeal by the General Counsel), such declination and action did not vest the state court with jurisdiction; to this effect see also Retail Clerks Local No. 1564 (A.F.L.) v. Your Food Stores, 10 Cir., 225 F.2d 659. In the most recent pronouncement of the United States Supreme Court on the subject, a majority held (Guss v. Utah Labor Relations Board, 1957, 353 U.S. 1, 77 S.Ct. 609, 1 L.Ed.2d 601) that the L.M.R.A. has so far displaced the power of the states to deal with labor relations matters affecting interstate commerce, that the states may only act in those cases where the Board has ceded jurisdiction to a state agency pursuant to Title 29 U.S.C.A. § 160(a). There the Board had declined to issue a complaint on the specific ground that the activities were "predominantly local in character," thus apparently following its revised jurisdictional standards. Since that decision it would seem that we may not consider the volume of interstate commerce involved, even though such volume may be below the minimums provided in the Board's standards.

In the prevention of unfair labor practices the Labor Board may "take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter * * *." 29 U.S.C.A. § 160(c). This case does not appear to come within any of the recognized fact situations which have been held to permit the exercise of state jurisdiction; for those cases see, among others: United Construction Workers, etc. v. Laburnum Const. Corp., 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (common law torts accompanied by violence); Tallman Co. v. Latal, Mo., 284 S.W.2d 547 (violence); United Automobile, A. & A. I. Workers of America v. Wisconsin Empl. Relations Bd., 351 U.S. 266, 76 S.Ct. 794, 100 L.Ed. 1162 (mass picketing, threats, and obstruction of highways); Allen-Bradley Local No. 1111, etc. v. Wisconsin Employment Relations Board, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154 (mass picketing and violence). We may probably say that state jurisdiction has not been foreclosed, or the field "pre-empted," where there is substantial evidence to show violence, injury or

damage to persons or property, or circumstances calling for the exercise of state or local police powers. No such situation was shown here.

In the case of Born v. Laube, 9 Cir., 213 F.2d 407, 410, suit was filed by a discharged employee against the employer and the union for back-pay, for reinstatement, and for punitive damages; plaintiff alleged that he was discharged by reason of threats or coercion exerted on the employer by the union's representative. That conduct was held to be an unfair labor practice. A dismissal of the case was affirmed on the ground that the procedures and the remedies provided in and by the L.M.R.A. were exclusive, even though plaintiff sought punitive damages. The court there discussed certain special situations in which relief may be sought in the courts under the provisions of the act, and held that these provisions were not applicable. The court said, in part: " * * * the Act's provisions for a comprehensive remedy preclude other action by way of a different or additional remedy for the correction of the same grievance." A per curiam opinion on rehearing appears at 9 Cir., 214 F.2d 349; there the court distinguished the Laburnum case, supra, and the line of cases based on a showing of violence or the necessity for the exercise of local police power; it further noted that under the procedure of the Labor Board the plaintiff had available the remedy of reinstatement with back pay. See also Anson v. Hiram Walker & Sons, Inc., 7 Cir., 222 F.2d 100, where, in a suit of the same type, the procedure and remedies provided by the federal act were held to be exclusive; and see Amazon Cotton Mill Co. v. Textile Workers' Union, 4 Cir., 167 F.2d 183, where it was held that, except as provided in certain special statutory situations (there discussed and explained) all jurisdiction over unfair labor practices is vested in the Labor Board; the court there also noted that recompense for wages lost on account of an unfair labor practice is a matter for the Labor Board. And see: Friendly Society of Engravers, etc. v. Calico Engraving Co., 4 Cir., 238 F.2d 521, to the same general effect; Sterling v. Local

438, etc., 207 Md. 132, 113 A.2d 389, and Mahoney v. Sailors' Union, 45 Wash.2d 453, 275 P.2d 440, reaffirming generally the exclusiveness of the jurisdiction of the Labor Board in matters constituting unfair labor practices, especially in those cases where compensatory procedures and remedies are provided under the Act. The cases as a whole recognize the exceptions existing upon a showing of violence, the necessity of maintaining public safety and order, the obstruction of highways, and local situations requiring the application of the police power.

In the present case the very gist of plaintiffs' allegations is a charge of an unfair labor practice, i. e., a discrimination on account of union activities. Plaintiffs eliminated, by amendment, their claims for punitive damages. The damages sought were for "lost wages," and the loss of "seniority rights and other privileges." The "other privileges" were not specified. The relief which the Labor Board might have granted, had it seen fit to act, was substantially equivalent to that sought in the present suit; "reinstatement" would or might include a restoration of seniority; an award of back-pay would recompense for the "lost wages." We do not mean to say, however, that the measures of relief which might be granted by the court and the Labor Board must be identical.

We have determined that under the foregoing, and other authorities, the circuit court did not have jurisdiction of this suit. Counsel for plaintiffs has not seen fit to brief that question here, although it was specifically raised in the trial court by motion and answer, and is fully briefed here by the defendants. The presence of individual defendants does not alter the propriety of this conclusion. The individuals were joined on the theory that they conspired to procure the discharge of the plaintiffs for union activities and as "agitators" and troublemakers; no such cause of action was established against them and the court so held, although this may be immaterial. These defendants were thus charged with an unfair labor practice which

would subject them, personally, to the jurisdiction of the board (29 U.S.C.A. § 160(a), and note particularly the words "to prevent any person from engaging in any unfair labor practice * * *"). Moreover, the usual form of order issued by the board is directed to the employer and to its officers and agents. N. L. R. B. v. Landis Tool Co., 3 Cir., 145 F.2d 152; N.L.R.B. v. Sunbeam Electric Mfg. Co., 7 Cir., 133 F.2d 856; LeTourneau Co. of Ga. v. N. L. R. B., 5 Cir., 150 F.2d 1012. In the last-cited case it was held that the decree of enforcement of a Labor Board order bound "parties and their privies," that the employer's officers and agents were "privies," though not parties personally, and that any such person was bound upon notice. In the case of N. L. R. B. v. Hopwood Retinning Co., 2 Cir., 104 F.2d 302, the president of an employer was held guilty of contempt for violation of a Labor Board order which had been sustained and enforced by the court. It is apparent that the Labor Board could effectively remedy any unfair labor practice on the part of individual employee-defendants. In the case of Schatte v. International Alliance, etc., 9 Cir., 182 F.2d 158, 159, the court apparently did not consider that the presence of individual defendants affected its conclusion that exclusive jurisdiction was in the Board under the Labor Management Act. The presence of the individual defendants here does not affect the conclusion which we have reached.

Plaintiffs alleged in their reply that the arbitration "was used as a sham and artifice by said union and Emerson Electric Company to remove these plaintiffs from the employment ranks for the reason that these plaintiffs had been former union officers and stewards and had in the past been critical of union policy * * *." It is entirely possible that this constituted the assertion of an independent unfair labor charge, but it is so closely associated with the allegations of the petition (already discussed) that we need not consider the point. In any event, the reply makes it entirely clear that plaintiffs primarily charge unfair labor practices.

If this case were not thus determined on the question of jurisdiction it would be necessary to consider the adequacy of appellants' brief under Rule 1.08, 42 V.A.M.S. The statement of facts is essentially a digest of the pleadings and of the testimony of each witness separately, thus consuming approximately 25 pages. This is not the "fair and concise statement of facts" required by the rule, although the proper form of statement may be *followed* by a statement of the testimony of each witness, if desired. Most, if not all, of the "Points" listed under "Points and Authorities" are too general to constitute a compliance with our rule. They fail to state any reasons "why" the court was in error in ruling as it did in each instance. But it would be an act of supererogation to elaborate further on the subject under the present circumstances.

The judgment is reversed and the cause is remanded, with directions to set aside the judgment and to dismiss the cause for lack of jurisdiction. It is so ordered.

All concur.